

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF BROCKTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| AVON PRODUCTS, INC.; ANDREA JUNG; CHARLES W. CRAMB; STEPHEN IBBOTSON; SIMON N.R. HARFORD; RICHARD S. FOGGIO; W. DON CORNWELL; EDWARD T. FOGARTY; FRED HASSAN; MARIA ELENA LAGOMASINO; ANN S. MOORE; PAUL S. PRESSLER; GARY M. RODKIN; PAULA STERN; LAWRENCE A. WEINBACH; and V. ANN HAILEY, | |
| Defendants. | |

### INTRODUCTION

Plaintiff, City of Brockton Retirement System ("Brockton" or "Plaintiff"), by its undersigned attorneys, alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements issued by Avon Products, Inc. ("Avon" or the "Company"), wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, and information readily obtainable on the internet.

### NATURE OF THE ACTION

1.       This is a class action brought on behalf of all persons or entities who either (1) were Avon shareholders as of the close of business on March 17, 2011, March 17, 2010, March 18, 2009, March 14, 2008, or March 15, 2007 and therefore eligible to vote proxies or (2)

purchased or otherwise acquired shares of Avon's common stock from July 31, 2006 through and including May 24, 2011 (the "Class Period") for violations of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Avon is a leading global beauty company, with over $10 billion in annual revenue.  As the world's largest direct seller, Avon markets to women in more than 100 countries through approximately 6.5 million active independent Avon Sales Representatives.  Avon's growth in recent years has been fueled by overseas sales, particularly in emerging markets. Avon is headquartered in New York City and incorporated in New York.

3.      During the Class Period, Defendants falsely assured investors that the Company had effective internal controls and accounting systems, as required under the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§78dd-1, *et seq*.   Avon disclosed, in October 2008, that it had begun an investigation into possible FCPA violations in China in June 2008.  Unbeknownst to investors, however, the Company had an illegal practice of paying bribes in violation of the FCPA, extending as far back as 2004 and which continued even after its October 2008 disclosure, until as recently as last year.  Despite its certifications of the effectiveness of its internal controls, Avon's internal controls were severely deficient, allowing the Company to engage in millions of dollars of improper payments in over a dozen countries throughout the Class Period.

4.      As a result of Defendants' materially misleading statements and omissions, Plaintiff and other members of the Class have suffered significant damages.

## JURISDICTION AND VENUE

5.      The claims alleged herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations of the Securities and Exchange

Commission ("SEC") promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5, and under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

6.       This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.       Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

8.       In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

<u>**PARTIES**</u>

9.       Plaintiff, City of Brockton Retirement System, was an Avon shareholder as of the close of business on March 18, 2009, March 14, 2008, and March 15, 2007 and therefore was eligible to vote proxies and purchased Avon common stock at artificially inflated prices during the Class Period, as set forth in the accompanying certification, which is incorporated by reference herein, and has been damaged thereby.

10.      Defendant Avon is a corporation that is headquartered in New York City.  The Company's common stock is listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AVP."  Avon is a leading global beauty company, and the world's largest direct seller.  Avon markets to women in more than 100 countries through approximately 6.5 million active independent Avon Sales Representatives.

11.     Defendant Andrea Jung ("Jung") has served as the Company's Chief Executive Officer ("CEO") and as Chairman of the Board of Directors of the Company at all relevant times hereto.  In this capacity, and as detailed herein, Jung made false and misleading statements throughout the Class Period.

12.     Defendant Charles W. Cramb ("Cramb") is the Vice Chairman of Avon's Developed Market Group.  He has also been Chief Finance and Strategy Officer since September 2007 and will continue on an interim basis until his recently named replacement joins Avon in the fall of 2011.  Prior to that, he served as Executive Vice President, Finance and Technology and Chief Financial Officer.  He has served as the Company's principal financial officer at all relevant times hereto.  In this capacity, and as detailed herein, Cramb made false and misleading statements throughout the Class Period.

13.     Defendant Stephen Ibbotson ("Ibbotson") has served as the Company's Group Vice President and Corporate Controller since May 2009.  In this capacity, and as detailed herein, Ibbotson made false and misleading statements during the Class Period.

14.     Defendant Simon H.R. Harford ("Harford") served as the Company's Group Vice President and Corporate Controller from July 2008 to May 2009.  In this capacity, and as detailed herein, Harford made false and misleading statements during the Class Period.

15.     Defendant Richard S. Foggio ("Foggio") served as the Company's Group Vice President and Corporate Controller from prior to the beginning of the Class Period to July 2008 and continues to serve as Group Vice President.  In this capacity, and as detailed herein, Foggio made false and misleading statements during the Class Period.

16.     Defendant W. Don Cornwell ("Cornwell") served as a Director of the Company. In this capacity, and as detailed herein, Cornwell was responsible for the false and misleading statements in the Company's proxy statements.

17.     Defendant Edward T. Fogarty ("Fogarty") served as a Director of the Company. In this capacity, and as detailed herein, Fogarty was responsible for the false and misleading statements in the Company's proxy statements.

18.     Defendant Fred Hassan ("Hassan") served as a Director of the Company. In this capacity, and as detailed herein, Hassan was responsible for the false and misleading statements in the Company's proxy statements.

19.     Defendant Maria Elena Lagomasino ("Lagomasino") served as a Director of the Company. In this capacity, and as detailed herein, Lagomasino was responsible for the false and misleading statements in the Company's proxy statements.

20.     Defendant Ann S. Moore ("Moore") served as a Director of the Company. In this capacity, and as detailed herein, Moore was responsible for the false and misleading statements in the Company's proxy statements.

21.     Defendant Paul S. Pressler ("Pressler") served as a Director of the Company. In this capacity, and as detailed herein, Pressler was responsible for the false and misleading statements in the Company's proxy statements.

22.     Defendant Gary M. Rodkin ("Rodkin") served as a Director of the Company. In this capacity, and as detailed herein, Rodkin was responsible for the false and misleading statements in the Company's proxy statements.

23.     Defendant Paula Stern ("Stern") served as a Director of the Company.  In this capacity, and as detailed herein, Stern was responsible for the false and misleading statements in the Company's proxy statements.

24.     Defendant Lawrence A. Weinbach ("Weinbach") served as a Director of the Company.  In this capacity, and as detailed herein, Weinbach was responsible for the false and misleading statements in the Company's proxy statements.

25.     Defendant V. Ann Hailey ("Hailey") served as a Director of the Company.  In this capacity, and as detailed herein, Hailey was responsible for the false and misleading statements in the Company's proxy statements.

26.     Defendants Jung, Cramb, Ibbotson, Harford, Foggio, Cornwell, Fogarty, Hassan, Lagomasino, Moore, Pressler, Rodkin, Stern, Weinbach, and Hailey are collectively referred to herein as the "Individual Defendants."    Defendants Jung, Cornwell, Fogarty, Hassan, Lagomasino, Moore, Pressler, Rodkin, Stern, Weinbach, and Hailey are collectively referred to herein as the "Director Defendants."  Defendants Jung, Cramb, Ibbotson, Harford, and Foggio are collectively referred to herein as the "Officer Defendants."

## BACKGROUND

27.     Avon is a leading global beauty company, with over $10 billion in annual revenue.  As the world's largest direct seller, Avon markets to women in more than 100 countries through approximately 6.5 million active independent Avon Sales Representatives.  Avon's growth in recent years has been fueled by overseas sales, particularly in emerging markets in Latin America and China.

28.     In October 2008, Avon disclosed that it had been investigating possible FCPA violations in China since June 2008.

29.     Despite the findings of its ongoing internal investigation, throughout the Class Period, the Officer Defendants certified that Avon had effective internal controls.  Unbeknownst to investors, however, the Company continued to violate the FCPA, and its internal controls were severely deficient, allowing the Company to engage in millions of dollars of fraudulent transactions in over a dozen countries throughout the Class Period.

30.     Since Avon's initial disclosure of its FCPA probe in October 2008, four executives have been suspended and then fired by Avon, and the *Wall Street Journal* has reported, and Avon has confirmed, that potential FCPA violations appear to exist in numerous other markets in which the Company operates.  After the market closed on April 12, 2010, the market learned that Avon had suspended its employees and expanded the scope of its internal FCPA investigation.  In reaction to this news, Avon's stock price plummeted 8% the next day.

31.     On May 4, 2011, the *Wall Street Journal* reported that Avon's "internal investigation into possible bribery of foreign officials has uncovered more potential wrongdoing, with evidence of improper payments to government officials found in several countries beyond the probe's original focus of China . . ."  Ellen Byron, *Avon Bribe Investigation Widens*, Wall St. J., May 4, 2011 (May 5, 2011 print edition).  The article reported that the probe found, as recently as 2010 and as far back as 2004, "millions of dollars of questionable payments to officials in Brazil, Mexico, Argentina, India and Japan in amounts that are 'not insignificant' . . ."  *Id.*  The article also reported that "[o]ne employee in these markets has been suspended, and more suspensions are pending."  *Id.*  In reaction to this news, over the course of May 4 and May 5, 2011, Avon's shares fell $2.20 per share or over 7%.

32.     The *Journal* further reported, on May 25, 2011, that federal prosecutors from the Southern District of New York's Complex Fraud Unit were actively investigating possible FCPA

violations at Avon and "seeking more information about the role employees at the company's New York headquarters, including some former senior officials, may have played in possible violations . . ."  Ellen Byron & Michael Rothfeld, *Feds Look at Avon Bribery Allegation*, Wall St. J., May 25, 2011.  According to the article, "Evidence of potential wrongdoing has been found in several countries, with internal investigators turning up millions of dollars of questionable payments to officials in Brazil, Mexico, Argentina, India and Japan, according to a person familiar with the matter. The possible wrongdoing happened as recently as last year and as far back as 2004, the person said."  *Id.*  In reaction to this news, Avon's share price fell from $29.98 on May 24, 2011 to close at $29.15 on May 25, a loss of $0.83 per share or almost 3%.

33.     On May 26, 2011, the London-based news organization The Independent, reported that on May 25, 2011 "federal prosecutors in Manhattan have questioned a number of former employees from the company's New York headquarters in recent weeks – and that they want to find and question even more former staff."

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

34.     Avon began investigating FCPA violations in June 2008 and first disclosed these possible violations on October 20, 2008.  In its Form 8-K filing, the Company stated:

> Avon Products, Inc. (NYSE: AVP) announced today, October 20, 2008, that it is voluntarily conducting an internal investigation of its China operations, focusing on compliance with the Foreign Corrupt Practices Act ("FCPA"). The Company, under the oversight of the Audit Committee, commenced in June 2008 an internal investigation after it received an allegation that certain travel, entertainment and other expenses may have been improperly incurred in connection with the Company's China operations. To lead the investigation, the Company has engaged the independent international law firm of Mayer Brown LLP.

> The Company has voluntarily contacted the Securities and Exchange Commission and the United States Department of Justice to advise both agencies that an internal investigation is underway. The internal investigation is in its early stage and no conclusion can be drawn at this time as to its outcome.

35.     Avon's second quarter ("Q2") 2008 Form 10-Q, filed July 30, 2008, did not mention the investigation, nor did CEO Jung or Vice Chairman and Chief Finance and Strategy Officer Charles Cramb mention it on the earnings call on that same date, despite discussing the Company's results in China.   When asked about the possibility of using service contracts in China, Cramb stated, "We're very pleased with our business model in China right now in terms of the way we operate. I'm sure some of our peer groups are doing things a bit differently, but at this point in time we're seeing very strong revenue and rep growth, so we think our model is the right one for the moment."

36.     Avon's Q3 2008 Form 10-Q, filed October 30, 2008, stated:

We are voluntarily conducting an internal investigation of our China operations, focusing on compliance with the Foreign Corrupt Practices Act. The internal investigation, which is being conducted under the oversight of the Audit Committee, commenced in June 2008 after we received an allegation that certain travel, entertainment and other expenses may have been improperly incurred in connection with our China operations. We have voluntarily contacted the Securities and Exchange Commission and the United States Department of Justice to advise both agencies that an internal investigation is underway. Because the internal investigation is in its early stage, we cannot predict how the resulting consequences, if any, may impact our internal controls, business, results of operations or financial position.

37.     The Company made an identical statement declining to predict any results of the investigation in its 2008 Form 10-K, filed on February 20, 2009, and its Q1 2009 Form 10-Q, filed on May 5, 2009.

38.     In its earnings call on February 20, 2009, CEO Jung stated that China was "[a]nother bright spot in the portfolio" as revenue in local currency grew 17% and active representatives grew 88%.   In Avon's earnings call on May 5, 2009, CEO Jung stated, "Just a comment about China. We continue to bring in over 40,000 new sales promoters each month. Active representatives in this market were up over 40% in the quarter. We now have almost 0.5

million active representatives in China. So the direct selling business in this market remains healthy and growing."

39.     In its Q2 2009 Form 10-Q, released on July 30, 2009, Avon announced that it had widened its probe to include additional countries.  However, the disclosure suggested that it was merely a routine compliance check.

> We are conducting an internal investigation under the oversight of the Audit Committee and with the assistance of outside independent counsel into compliance with the Foreign Corrupt Practices Act (FCPA) and related U.S. and foreign laws. The initial focus of the internal investigation has been on certain expenses incurred in connection with our China operations. In order to evaluate our compliance efforts, we are also reviewing our practices relating to FCPA and related U.S. and foreign laws in additional countries.

The Q3 2009 Form 10-Q filed on October 29, 2009 contained an identical disclosure.

40.     In the Company's July 30, 2009 earnings call, Jung stated, "In China, we were pleased that revenues in local currencies increased 13%. This was a strong improvement over the first quarter's growth rate as we had expected. And as noted, active representatives in China were up 52%. Moreover, our recruiting pipeline remains as strong as ever. So overall we continue to feel very good about our progress in this important market."  When asked a question about the rate of growth in China, she stated, "But I'm pleased with the progress, and without giving you a forecast for whether the growth will accelerate, I think you can continue to look at China as a major growth driver for the corporation."

41.     According to Avon's Q3 2009 Form 10-Q, filed October 29, 2009, revenue in China fell 11% in local currency, although Active Representatives grew 7%, as did revenue growth from direct selling.  In the October 29, 2009 earnings call, CEO Jung discussed the hybrid model there, with a mix of beauty boutique stores and direct selling:

> [I]f you look at the third quarter sales in China, there were some factors unique to this market. Let's just separate it for a second from beauty boutiques versus the

sales promoters. I think as we said before, we're just -- this is an evolution in China. It's unique to China model that has this hybrid business between beauty boutiques and sales promoters. And the business, obviously and logically, we're really changing our promotions to focus on the sales promoter side of the business. And the evolution is being done obviously in this particular case, has to be consistent with government regulations.

42.    In the Company's 2009 Form 10-K, filed on February 25, 2010, Avon disclosed that it had signed tolling agreements with the Justice Department and SEC and said that it could face substantial fines, civil and criminal penalties and other sanctions, depending on how the FCPA matter is resolved.

*We are investigating Foreign Corrupt Practices Act (FCPA) and related U.S. and foreign law matters, and from time to time we may conduct other internal investigations and compliance reviews, the consequences of which could negatively impact our business.*

From time to time, we may conduct internal investigations and compliance reviews, the consequences of which could negatively impact our business. Any determination that our operations or activities are not in compliance with existing United States or foreign laws or regulations could result in the imposition of substantial fines, interruptions of business, termination of necessary licenses and permits, and other legal or equitable sanctions. Other legal or regulatory proceedings, as well as government investigations, which often involve complex legal issues and are subject to uncertainties, may also follow as a consequence. It is our policy to cooperate with U.S. and foreign government agencies and regulators, as appropriate, in connection with our investigations and compliance reviews.

As previously reported, we have engaged outside counsel to conduct an internal investigation and compliance reviews focused on compliance with the FCPA and related U.S. and foreign laws in China and additional countries. The internal investigation and compliance reviews, which are being conducted under the oversight of our Audit Committee, began in June 2008. We voluntarily contacted the United States Securities and Exchange Commission and the United States Department of Justice to advise both agencies of our internal investigation and compliance reviews and we are, as we have done from the beginning of the internal investigation, continuing to cooperate with both agencies and have signed tolling agreements with them.

The internal investigation and compliance reviews, which started in China, are focused on reviewing certain expenses and books and records processes, including, but not limited to, travel, entertainment, gifts, and payments to third-

party agents and others, in connection with our business dealings, directly or indirectly, with foreign governments and their employees. The internal investigation and compliance reviews of these matters are ongoing. At this point we are unable to predict the duration, scope or results of the internal investigation and compliance reviews.

Any determination that our operations or activities are not in compliance with existing laws or regulations could result in the imposition of substantial fines, civil and criminal penalties, equitable remedies, including disgorgement, injunctive relief and other sanctions against us or our personnel. In addition, other countries in which we do business may initiate their own investigations and impose similar sanctions. Because the internal investigation and compliance reviews are ongoing, there can be no assurance as to how the resulting consequences, if any, may impact our internal controls, business, reputation, results of operations or financial condition.

43.     On April 13, 2010, Avon confirmed to the *Wall Street Journal* that it suspended three employees in Asia and one in New York during its FCPA investigation.  *See* Ellen Byron, *Avon Suspends Four Executives Amid Bribery Probe*, Wall St. J., April 13, 2010.  The suspended employees were S.K. Kao, described as president or general manager of Avon China; Jimmy Beh, described as head of finance or CFO for Avon China; C.Q. Sun, head of corporate affairs and government relations for Avon China; and Ian Rossetter in New York, former head of global internal audit and security and before that head of finance for Asia Pacific.  *Id.*  Rossetter was reported to have started a special assignment in mid-2009, reporting to Avon CFO Charles Cramb.  *Id.*  "The possible wrongdoing under investigation includes the alleged purchase of trips to France, New York, Canada and Hawaii for Chinese government officials with ties to Avon's business."  *Id.*  The article also reported that the probe had expanded to "a dozen or more countries" and included "Latin America, where the company garners the bulk of its sales and profits."  *Id.*  Avon's stock price closed down $2.77 to $31.99, falling 8 percent that day.

"If these reports are true it certainly brings into question the company's control on either employees or their own finances," said Sanford Bernstein analyst Ali Dibadj. "It certainly does not add to the credibility of the company, which has already been under some pressure recently."

Jessica Wohl & Donny Kwok, *Avon suspends four execs in China bribery probe*, Reuters, April 13, 2010.

44.     In the Company's Q1 2010 Form 10-Q, filed on April 30, 2010, Avon noted that selling, general and administrative expenses increased $141.9 million due in part to "significant professional and related fees associated with the FCPA matters . . ."  In addition, Net Global expenses increased 82% over the same quarter the previous years, an increase "primarily attributable to significant professional and related fees associated with the FCPA matters . . . Professional and related fees are expected to continue during the course of this investigation." The Company also made a similar disclosure to previous ones with regard to its FCPA probe:

> We are conducting these compliance reviews in a number of other countries selected to represent each of the Company's four other international geographic segments. The internal investigation and compliance reviews are focused on reviewing certain expenses and books and records processes, including, but not limited to, travel, entertainment, gifts, and payments to third-party agents and others, in connection with our business dealings, directly or indirectly, with foreign governments and their employees. The internal investigation and compliance reviews of these matters are ongoing, and we continue to cooperate with both agencies with respect to these matters. At this point we are unable to predict the duration, scope, developments in, results of, or consequences of the internal investigation and compliance reviews.

45.     In the Company's April 30, 2010 press release, CEO Jung noted an improvement in operating margin, "despite higher costs from our FCPA investigation."  In the Company's analyst call that day, with regard to the FCPA investigation, CEO Jung gave an update on the situation in China:

> However, I just wanted to begin my remarks this morning with some comments about China, which I know is top of mind for many of you. I'll talk specifically about our business performance. But first I just want to share my perspective on our FCPA investigation in that market. Given that this is an ongoing investigation and the facts are still under review we're limited, as you well know, in what we can say. But I want to be as responsive as I can and recap the status of our investigation to the extent possible.

Avon disclosed in October 2008 that an allegation had been made about possible FCPA violations in our China business relating to travel, entertainment and other expenses. The allegation came in the form of a letter written directly to me. As you would expect, I immediately turned the information over for proper handling and we began an internal investigation under the oversight of our audit committee and conducted by outside counsel. Most importantly, we voluntarily self-reported the allegation to the United States Securities and Exchange Commission, as well as the Department of Justice. And again, this was voluntary.

China is a unique and highly regulated market with its own specific requirements. Nevertheless, as a company that holds leadership positions in developing and emerging markets, we are also conducting compliance reviews related to FCPA in additional countries. We disclosed this in July 2009.

I want to clarify that we are conducting these compliance reviews in a selection of markets representing each of our 4 international business units outside of China. I also want to emphasize again that the allegation that triggered our investigation was in China only. Conducting compliance reviews in these additional markets is the appropriate thing to do in investigations of this type and as we stated, we've been cooperating with both governmental agencies.

Three weeks ago, as you know, 4 associates were placed on administrative leave specifically in connection with the China investigation. The decision to put people on administrative leave does not reflect any outcome from the investigation. Given this and given that the associates are not senior executive level officers of the company, we did not file a disclosure and name the names. So that's where we are in terms of FCPA. No conclusions can be drawn at this time. And as I said, the investigation has been going on since 2008. We've seen very little management distraction and I'm pleased that from what I can see, everyone all around the world is focused on running the business as we want them to be.

46.     On May 1, 2010, *The Wall Street Journal* reported on the filing, noting that Avon was "overhauling its China operations in the wake of an alleged bribery scandal and worsening results there, as the cosmetics company continues to struggle to capitalize on its ground-breaking entre to the world's most populous consumer-products market."  Ellen Byron, *Avon Bribery Probe Expands to Four Units*, Wall St. J., May 1, 2010.  According to the article, the China overhaul and expanding investigation "weighed on the company's first-quarter earnings . . ."  *Id.*

"Revenue from China fell 31% in the first quarter, leading to a $10 million operating loss at the unit." *Id.*

47.     On June 1, 2010, Fitch Ratings released a report about the potential impact of FCPA investigations and violations on credit ratings and included Avon as an example.

> The cost of investigations and ongoing compliance can be sizeable, and each company's liquidity and metrics over the medium term would need to be considered. Avon, with $10 billion in 2009 revenues, had $120 million in FCF [Free Cash Flow]. In April 2010 the company disclosed that the cost of the investigation would be in the $85 million - $95 million range, up from $35 million in 2009. The additional cost of widening the investigation represents a significant percentage of the company's 2009 FCF. While the company has more than $1 billion in cash on hand, Fitch's expectation of moderate FCF in the medium term was part of the rationale for the downgrade to 'A-' from 'A' on Feb. 2, 2010. Additional layers of investigatory or compliance-related expenses could hamper FCF for Avon and other companies that violate the FCPA. Continued relative weakness in FCF and/or increased leverage typically can provide the impetus for a downgrade or change in outlook for many corporations.

48.     In the Company's July 29, 2010 earnings press release, it stated that selling, general and administrative ("SG&A") expenses increased due in part to "costs associated with the company's internal FCPA investigation."

49.     Similarly, in its Q3 2010 10-Q filed on October 28, 2010, Avon disclosed increased SG&A expenses and a significant increase in Net Global expenses due to the FCPA investigation.  It stated, "Professional and related fees associated with the FCPA investigation and compliance reviews, while difficult to predict, are expected to continue during the course of this investigation."  Avon also attributed a decline in operating profit and margin in part to the investigation.  With regard to the probe generally, it stated, "At this point we are unable to predict the duration, scope, developments in, results of, or consequences of the internal investigation and compliance reviews."  However, the Company disclosed that its cooperation with the SEC and DOJ inquiries included but was not limited to "signing tolling agreements,

translating and producing documents and assisting with interviews."   Avon also disclosed the derivative actions filed against the Company related to the Company's compliance with the FCPA.   In Avon's earnings call that day, Cramb called the FCPA investigation "a significant cost that we never anticipated . . ."  In response to a question about FCPA costs, he also stated, "I can't talk about FCPA moving into the future."

50.     On February 8, 2011, Avon's released its 2010 results.   CEO Jung stated, "As we closed out the year, we continued to experience disappointing sales results which were negatively impacted by service disruptions in Brazil and weak performance in Russia."   The Company also reported higher costs associated with its internal FCPA probe, and fourth quarter revenue declined 45% in China, which the Company blamed on its transition from a hybrid model to a focus on direct selling.   Despite this transition plan, Active Representatives in China were down 68%.

51.     On February 20, 2011, the Company announced that Bennett Gallina, Senior Vice President, Western Europe, Middle East & Africa, Asia Pacific and China, "was placed on administrative leave in connection with the Company's previously disclosed internal investigation relating to the Company's China operations, and subsequently retired on February 22, 2011 after more than 30 years with the Company. Any bonuses payable are subject to being retained by the Company pending future determinations in connection with the internal investigation."

52.     On February 24, 2011, Avon filed its 2010 10-K.   With regard to its FCPA investigation, it stated in part:

> As previously reported in July 2009, in connection with the internal investigation, we commenced compliance reviews regarding the FCPA and related U.S. and foreign laws in additional countries in order to evaluate our compliance efforts. We are conducting these compliance reviews in a number of other countries

selected to represent each of the Company's four other international geographic segments. The internal investigation and compliance reviews are focused on reviewing certain expenses and books and records processes, including, but not limited to, travel, entertainment, gifts, use of third party vendors and consultants and related due diligence, joint ventures and acquisitions, and payments to third-party agents and others, in connection with our business dealings, directly or indirectly, with foreign governments and their employees. The internal investigation and compliance reviews of these matters are ongoing, and we continue to cooperate with both agencies with respect to these matters. At this point we are unable to predict the duration, scope, developments in, results of, or consequences of the internal investigation and compliance reviews.

Any determination that our operations or activities, including our licenses or permits, importing or exporting, or product testing or approvals are not in compliance with existing laws or regulations could result in the imposition of substantial fines, civil and criminal penalties, interruptions of business, modification of business practices and compliance programs, equitable remedies, including disgorgement, injunctive relief and other sanctions that we may take against our personnel or that may be taken against us or our personnel. In addition, pending the outcome of these matters, certain personnel actions have been taken, including the placing of the Senior Vice President, Western Europe, Middle East & Africa, Asia Pacific and China on administrative leave in connection with the internal investigation relating to our China operations, and additional personnel actions may be taken in the future. Further, other countries in which we do business may initiate their own investigations and impose similar sanctions. Because the internal investigation and compliance reviews are ongoing, there can be no assurance as to how the resulting consequences, if any, may impact our internal controls, business, reputation, results of operations or financial condition.

53.     On May 3, 2011, Avon released its first quarter 10-Q, providing further details on the widening scope of the FCPA investigation and the firings of the employees it had previously suspended.

In connection with the internal investigation, certain personnel actions have been taken, including the termination of four individuals previously placed on administrative leave in 2010 (former general manager for China; former head of corporate affairs for China; former head of finance for China; and former head of global internal audit and security, who was previously head of finance for Asia Pacific). Pending the outcome of the internal investigation and compliance reviews, additional personnel actions may be taken in the future.

Avon's revenue in China decreased by 35% in constant dollars between 2009 and 2010, and Active Representatives and units sold both declined by double-digits.

54.     Just before markets closed on May 4, 2011, The Wall Street Journal reported that Avon's "internal investigation into possible bribery of foreign officials has uncovered more potential wrongdoing, with evidence of improper payments to government officials found in several countries beyond the probe's original focus of China . . ." Ellen Byron, *Avon Bribe Investigation Widens*, Wall St. J., May 4, 2011 (May 5, 2011 print edition).  The article reported that the probe found, as recently as 2010 and as far back as 2004, "millions of dollars of questionable payments to officials in Brazil, Mexico, Argentina, India and Japan in amounts that are 'not insignificant' . . ."  *Id.*  The article also reported that "[o]ne employee in these markets has been suspended, and more suspensions are pending."  *Id.*

55.     According to the article, the process "has weighed on the company's reputation, distracted management and exposed the company to possible fines or charges from the Securities and Exchange Commission and Department of Justice."  *Id.*   It also quoted a May 4, 2011 research report from Sanford Bernstein analyst Ali Dibadj as stating, "Based on the track record of the past decade for Avon, we wonder whether this management team (even partially revamped) can effectively effectuate much needed sustainable change on the company."

56.     On May 10, 2011, Fitch downgraded its long-term Issuer Default Rating, bank credit facilities, and senior unsecured notes for Avon from BBB+ to BBB.  On May 23, 2011, the Company announced that Kimberly A. Ross would join the Company as Executive Vice President and Chief Financial Officer and was expected to start in the fall.  Upon her arrival, Charles Cramb will no longer serve as Chief Financial Officer of the Company but would continue to serve as Vice Chairman, Developed Market Group.

57.     On May 25, 2011, The Wall Street Journal reported that federal prosecutors from the Southern District of New York's Complex Fraud Unit were actively investigating possible FCPA violations at Avon and "seeking more information about the role employees at the company's New York headquarters, including some former senior officials, may have played in possible violations . . ."   Ellen Byron & Michael Rothfeld, *Feds Look at Avon Bribery Allegation*, Wall St. J., May 25, 2011.   According to the article, "Evidence of potential wrongdoing has been found in several countries, with internal investigators turning up millions of dollars of questionable payments to officials in Brazil, Mexico, Argentina, India and Japan, according to a person familiar with the matter. The possible wrongdoing happened as recently as last year and as far back as 2004, the person said."   *Id.*

58.     Avon proxy statements were filed on March 25, 2011, March 25, 2010, March 27, 2009, March 31, 2008, and March 23, 2007.   Shareholders as of close of business on March 17, 2011, March 17, 2010, March 18, 2009, March 14, 2008, and March 15, 2007, respectively, were eligible to vote.   The proxy materials are described as being provided "in connection with the solicitation by the Board of Directors of Avon Products, Inc. . . . of proxies to be voted at our Annual Meeting of Shareholders . . ."

59.     The first proposal of each proxy statement was for election of directors.   The proxy states:   "**The Board of Directors recommends that you vote FOR the election as directors of the nominees listed below.**"   (Emphasis in original.)

60.     Under the heading "***Risk Oversight***" the 2011 proxy statement declares:

The Board of Directors administers its risk oversight function primarily through the Audit Committee, which oversees the Company's risk management practices. The Audit Committee is responsible for, among other things, discussing with management on a regular basis the Company's guidelines and policies that govern the process for risk assessment and risk management. This discussion includes the Company's major risk exposures and actions taken to monitor and control such

exposures. The Audit Committee also has oversight of the Company's risk management committee, composed of certain key executives. The Company has an enterprise risk management process and provides regular updates to the Audit Committee with respect to this process. The Audit Committee also regularly reports to the full Board on the Company's risk management practices. While the Audit Committee has primary responsibility for overseeing risk management, other Board Committees also consider risk within their areas of responsibility, as appropriate. We believe that the combination of the combined position of CEO and Chairman, the lead independent director and the roles of the Board and the Board Committees provide the appropriate leadership to help ensure effective risk oversight.

The 2010 proxy statement contains a similar disclosure without the last two sentences. It also states, "If an identified risk poses an actual or potential conflict with management, our lead independent director may conduct the assessment or do so with the aid of other independent directors, as appropriate."

61.     The materials describe the primary responsibilities of the Audit Committee, in substantially similar form each year, as "assist[ing] the Board in fulfilling its responsibility to oversee the integrity of our financial statements, controls and disclosures, our compliance with legal and regulatory requirements, the qualifications and independence of our independent auditors and the performance of our internal audit function and independent accountants." In addition, its responsibilities include "reviewing with management and the independent auditors our disclosure controls and procedures and our internal controls." To fulfill its duties, "[t]he Committee has the authority to conduct any investigation appropriate to fulfilling its purpose and responsibilities." All of the proxy statements indicated that the Audit Committee's charter was available on the Company's investor website, and the 2009 proxy statement included the Committee's charter in an annex, revised as of February 5, 2009.

62.     Members of the Audit Committee listed in the 2011 proxy statement included Chair Lawrence A. Weinbach, W. Don Cornwell, V. Ann Hailey, and Paul S. Pressler. All four

were also listed as members in the 2009 and 2010 proxy statements, along with Edward T. Fogarty.  Members listed in the 2007 and 2008 proxy statements included Weinbach, Cornwell, Fogarty, and Maria Elena Lagomasino.

63.     The 2011 proxy statement also disclosed the derivative actions related to the internal investigation:

> Beginning in July and August 2010, several derivative actions were filed against certain present or former officers and/or directors of the Company that allege breach of fiduciary duty, and, in certain complaints, abuse of control, waste of corporate assets, unjust enrichment and/or proxy disclosure violations, relating to the Company's compliance with the Foreign Corrupt Practices Act. The relief sought in one or more of the derivative complaints includes certain declaratory and equitable relief, restitution, unspecified damages, exemplary damages and interest. Consistent with the Company's By-Laws and the New York Business Corporation Law, expenses in connection with the foregoing are being paid by the Company on behalf of certain present or former officers and/or directors.

64.     Another proposal of the proxy statement was for ratification of the appointment by the Audit Committee of the Board of Directors of PricewaterhouseCoopers LLP ("PwC") as Avon's independent registered public accounting firm.  The Board of Directors recommended votes for the ratification of the appointment of PwC each year.  PwC began auditing Avon in 1989.

65.     The statements to the marketplace in ¶¶ 34 - 64 were materially false and misleading and/or failed to disclose that:  (1) the Company's internal controls were severely deficient and not properly designed to detect improper payments under the FCPA; (2) the Company was violating the Foreign Corrupt Practices Act; or (3) the Company's sales and revenue in China and other important emerging markets were dependent on the Company's illegal practice of paying bribes in direct violation of the Foreign Corrupt Practices Act.  In addition, the statements contained in Avon's Proxy statements from 2006 through 2010 omitted to disclose that Avon was violating the FCPA and that Avon's internal controls were deficient

and unable to detect improper payments under the FCPA and misled investors with regard to the Audit Committee's ability to manage the Company's risk.  Plaintiff and other Avon shareholders were misled into voting to re-elect Avon Board members and re-authorize PwC to continue to act as Avon's outside auditors based upon the misleading statements and material omissions contained in the proxy materials.

### THE TRUTH BEGINS TO EMERGE

66.     After the market closed on April 12, 2010, the market learned that Avon had suspended four executives in connection with its FCPA investigation, including three senior executives in China and its head of internal audit, and that the investigation had expanded to a dozen or more countries.

67.     Avon's stock price plummeted 8% the next day.  The stock fell $2.77 per share from $34.76 on April 12, 2010 to close at $31.99 on April 13, 2010, with higher than normal trading volume of over 21 million shares.  This drop was reported to wipe out $1.1 billion in shareholders' equity.

68.     Before the market opened on October 28, 2010, the Company filed its third quarter 10-Q.  The market learned that Avon's sales had plunged 31% in China, with units sold down 28% and Active Representatives down 36%, which the Company blamed on its transition from a hybrid model to a focus on direct selling.

69.     Following the release of this news, Avon's stock price fell by 5.6%, $1.85 per share, from $32.86 on October 27, 2010 to close at $31.01 on October 28, 2010, with higher than normal trading volume of over 28 million shares.

70.     On February 8, 2011, before the market opened, Avon released an 8-K with its 2010 results.  Avon's shares fell 3% or $0.88, from $29.35 on February 7, 2011 to $28.47 on February 8, 2011, with higher than normal trading volume of over 18 million shares.  The

Company reported higher costs associated with its internal FCPA probe, and fourth quarter revenue declined 45% in China.  Despite its transition plan, Active Representatives in China were down 68%.

71.     Just before the market closed on May 4, 2011, the *Wall Street Journal* reported that more questionable payments had been made in additional countries as recently as 2010.  *See* Ellen Byron, *Avon Bribe Investigation Widens*, Wall St. J., May 4, 2011.  Shares fell quickly to $30.32, down from $30.91 the previous day and down from an intraday price of $31.23 at 3:30 pm.  The next day shares continued to plummet an additional $1.61 per share or 5% to close at $28.71 on May 5, 2011, with higher than normal trading volume of over 10 million shares.  The two day loss was $2.20 per share or over 7%.  The *Wall Street Journal* later noted that the drop came "as Avon's internal probe, which investors had hoped was near completion, appeared to grow more complex."  Ellen Byron, *Avon's Stock Is Hit by New Worries About a Widening Bribery Probe*, Wall St. J., May 6, 2011.

72.     Finally, following another article in the *Wall Street Journal* about the active nature of the Justice Department's investigation into Avon, the role of senior officials in possible violations, and the possibility of criminal charges, Avon's share price fell from $29.98 on May 24, 2011 to close at $29.15 on May 25, a loss of $0.83 per share or almost 3%.

## ADDITIONAL *SCIENTER* ALLEGATIONS

73.     Defendants acted knowingly and/or with deliberate recklessness in issuing false and misleading financial statements and information to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.  Defendants Jung and Cramb either knew, or recklessly disregarded, that Avon's internal controls were deficient in that they were not detecting improper payments under the

FCPA.  The Individual Defendants were motivated to materially misrepresent the true nature of the Company's business, operations, and financial affairs to the public and regulators in order to keep the Company's share price artificially high.

**LOSS CAUSATION / ECONOMIC LOSS**

74.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price, and operated as a fraud or deceit on acquirers of the Company's common stock.  As detailed above, when the truth about Avon's violation of U.S. law was revealed, the Company's stock declined as the prior artificial inflation came out of its common stock price.  The declines in Avon's common stock price, identified in ¶¶ 67 to 72,  were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by the Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

75.     At all times relevant, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading because they failed to disclose that Avon was engaged in activity that violated U.S. laws, including the Foreign Corrupt Practices Act and entirely lacked the internal controls to prevent such violations, as alleged herein.  Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Avon's common stock price to be artificially inflated.  Plaintiff and

other Class members purchased Avon's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who acquired Avon common stock from July 31, 2006 through and including May 24, 2011, and who were damaged thereby, and all Avon shareholders as of close of business on March 17, 2011, March 17, 2010, March 18, 2009, March 14, 2008, or March 15, 2007 and therefore eligible to vote on the proxy statements issued by Avon.  Excluded from the Class are the Defendants, the Company's officers and directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any other entity in which any of the Defendants has a controlling interest or of which the Company is a parent or subsidiary.

77.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  As of March 31, 2011, the Company had approximately 430 million shares of its common stock outstanding, which were actively traded on the NYSE.  Although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds of members of the Class who traded Company common stock during the Class Period.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants violated federal securities laws based upon the facts alleged herein;

(b)     With regard to the § 10(b) claim, whether those Defendants acted knowingly or with deliberate recklessness in making materially misleading statements and/or omissions during the Class Period;

(c)     With regard to the § 14(a) claim, whether those Defendants acted negligently in making materially misleading statements and/or omissions in the Company's proxy statements;

(d)     Whether the market prices of the Company's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

(e)     Whether the members of the Class are entitled to injunctive relief; and

(f)     Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

79.     Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal laws as complained of herein.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

81.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

82.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the market doctrine in that:

(a)     Defendants failed to disclose material facts during the Class Period;

(b)     Avon's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(c)     Avon made available periodic public reports about its financial results and condition;

(d)     Avon regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Avon was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and relevant details of which entered the public marketplace;

(f)     the misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g)     Plaintiff and members of the Class purchased their Company stock between the time Defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

83.     Based upon the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's common stock.

84.     As a result of the foregoing, the market for Avon's common stock promptly digested current information regarding Avon from all publicly-available sources and reflected

such information in the price of Avon's common stock.  Under those circumstances, all purchasers of Avon's common stock during the Class Period suffered similar injury through their purchase of Avon's common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

85.    The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Avon who knew that those statements were false, misleading or omitted necessary information when they were made.

## COUNT I

### (Against Avon and the Officer Defendants)
### Violations of § 10(b) of the Exchange Act and SEC Rule 10b-5

86.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.    This Count is asserted against Avon and the Officer Defendants and is based upon § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

88.     During the Class Period, Avon and the Officer Defendants, singly and in concert, directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to which they knowingly or with deliberate recklessness engaged in acts, transactions, practices and course of business which operated as fraud and deceit upon Plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase Avon's common stock during the Class Period at artificially inflated prices.

89.     Throughout the Class Period, Avon acted through the Officer Defendants, whom it portrayed and represented to the financial press and public as its valid representatives.  The willfulness, motive, knowledge and recklessness of the Officer Defendants are therefore imputed to Avon, which is primarily liable for the securities law violations of the Officer Defendants.

90.     As a result of the failure to disclose material facts, the information Avon and the Officer Defendants disseminated to the investing public was materially false and misleading as set forth above, and the market price of Avon's common stock was artificially inflated during the Class Period.  In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff and other members of the Class relied, to their detriment, on the integrity of the market price of Avon's common stock in purchasing shares of the Company.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

91.     Plaintiff and other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

92.     By reason of the foregoing, Avon and the Officer Defendants directly violated § 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of Avon's common stock during the Class Period.

## COUNT II

**(Against the Avon and the Director Defendants)**
**Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9**

93.     Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

94.     This Count is asserted against Avon and the Director Defendants and is based upon § 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

95.     Avon's March 23, 2007, March 31, 2008, March 27, 2009, March 25, 2010, and March 25, 2011 Proxy Statements violated § 14(a) and Rule 14a-9 because they contained materially false or misleading statements or omitted material facts necessary in order to make the statements therein not false or misleading, including as to the extent of Avon's FCPA violations and that Avon completely lacked the internal controls necessary to avoid widespread FCPA violations.  The Director Defendants acted negligently in soliciting the proxies, and the proxy solicitation was an essential link to the transactional cause of harm, the reelection of Avon's directors.

96.     By reason of the foregoing, Avon and the Director Defendants directly violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, injuring Plaintiff and the other members of the Class in connection with their ownership of Avon's common stock and eligibility to vote proxies and entitling them to damages and equitable relief.

## COUNT III

**(Against the Officer and Director Defendants)**
**Violations of § 20(a) of the Exchange Act**

97.     Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

98.     The Officer and Director Defendants, by virtue of their positions and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of § 20(a) of the Exchange Act.

99.     The Officer and Director Defendants have the power and influence and exercised same to cause Avon to engage in the illegal conduct and practices complained of herein.

100.     By reason of the conduct alleged in Count I of this Complaint, the Officer and Director Defendants are liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and are liable to Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of Avon's common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)     Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d)     Granting equitable and/or injunctive relief as permitted by law, equity, and federal statutory provisions sued on hereunder; and

(e)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 6, 2011
      New York, New York

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____
    Christopher Lometti (CL-9124)
    Daniel B. Rehns (DR-5506)
    88 Pine Street
    New York, NY 10005
    Telephone: 212-838-7797
    Facsimile: 212-838-7745
    clometti@cohenmilstein.com
    drehns@cohenmilstein.com

    Steven J. Toll
    1100 New York Avenue NW, Suite 500 West
    Washington, D.C. 20005
    Telephone: 202-408-4600
    Facsimile: 202-408-4699
    stoll@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**BERMAN DEVALERIO**
Jeffrey C. Block (JCB-0387)
Justin Saif
One Liberty Square
Boston, MA 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
jblock@bermandevalerio.com
jsaif@bermandevalerio.com

*Attorneys for Plaintiff*

33

## PLAINTIFF'S CERTIFICATION OF SECURITIES
## FRAUD CLASS ACTION COMPLAINT

I, Harold P. Hanna, Jr., Executive Director of the City of Brockton Retirement System

("Brockton" or the "System"), hereby certify that the following is true and correct to the best of

my knowledge, information and belief:

1.      I am the Executive Director of the City of Brockton Retirement System

("Brockton" or the "System") and am authorized to make legal decisions on behalf of the

System.

2.      Brockton has fully reviewed the facts and allegations of the complaint and has

authorized its filing by Berman DeValerio.

3.      Brockton did not purchase the securities that are the subject of this action at

the direction of counsel or in order to participate in any private action arising under the

Securities Act of 1933 or any other federal securities law.

4.      Brockton is willing to serve as a representative party on behalf of the class in

this action, including providing testimony at deposition and trial, if necessary.

5.      Brockton's transactions in the securities that are the subject of this complaint

are set forth in the chart attached hereto as Exhibit A.

6.      During the three year period preceding the date of this Certification Brockton

has sought to serve and is currently serving as a lead plaintiff or as a representative party on

behalf of a class in the following private actions arising under the federal securities laws:

> Medoff v. CVS Caremark Corp., 09-cv-00554 (D.R.I.)
> In re Accuray Inc. Sec. Litig., 4:09-cv-03362 (N.D. Cal.)
> In re Colonial BancGroup, Inc. Sec. Litig., 09-00104 (M.D. Ala.)
> In re Lehman Brothers Equity/Debt Sec. Litig., 08-cv-5523 (S.D.N.Y.)
> In re Washington Mutual Inc. Sec. Litig., 08-md-1919; C08-387 (W.D. Wash.)

7.      Brockton will not accept any payment for serving as a representative

party on behalf of the class beyond its  pro rata share of any possible recovery, except

for an award, as ordered or approved by the court, for reasonable costs and expenses

directly relating to its representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct. Executed this
28th day of June, 2011.

Harold P. Hanna, Jr.
Executive Director

2

## Avon Products Inc.
## Common Stock (Cusip 054303102)
## Exhibit A

Class Period: 07/31/06-05/24/11
City of Brockton Retirement System

| Trade Date | Transaction | No. Shares | Base Unit Price |
|---|---|---|---|
| 07/30/06 | Holdings | 0 | |
| 02/15/07 | BUY | 5,150 | $39.0959 |
| 02/21/07 | BUY | 3,100 | $38.9836 |
| 02/27/07 | BUY | 2,800 | $37.8231 |
| 03/01/07 | BUY | 518 | $36.7854 |
| 03/01/07 | BUY | 3,332 | $36.9611 |
| 08/15/07 | SELL | (14,900) | $33.9819 |
| 02/06/08 | BUY | 7,910 | $38.3903 |
| 02/07/08 | BUY | 2,700 | $38.6372 |
| 02/14/08 | BUY | 1,680 | $39.9402 |
| 03/07/08 | SELL | (2,700) | $36.9675 |
| 03/12/08 | BUY | 1,000 | $38.3840 |
| 03/31/08 | BUY | 3,900 | $39.4157 |
| 04/30/08 | BUY | 1,400 | $39.0984 |
| 07/15/08 | SELL | (5,140) | $34.6993 |
| 07/30/08 | SELL | (3,310) | $44.1288 |
| 10/21/08 | SELL | (6,440) | $29.8317 |
| 08/14/09 | SELL | (200) | $32.2900 |
| 08/26/09 | SELL | (100) | $32.4300 |
| 08/27/09 | SELL | (300) | $32.0133 |
| 09/15/09 | SELL | (100) | $31.7100 |
| 09/18/09 | SELL | (200) | $31.9900 |
| 10/06/09 | SELL | (100) | $33.2400 |
| 10/19/10 | BUY | 2,485 | $34.7817 |
| 10/19/10 | BUY | 7,455 | $34.7817 |
| 12/28/10 | SELL | (9,940) | $28.9100 |

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, liaison counsel for the Plaintiff, hereby certify that on July 6, 2011, I

filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all

parties named herein and/or counsel of record in the within action.

Daniel B. Rehns