UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/29/14
```

CITY OF BROCKTON RETIREMENT
SYSTEM, Individually and On Behalf of All
Others Similarly Situated

                    Plaintiffs,

    v.

AVON PRODUCTS, INC., ANDREA JUNG, and
CHARLES W. CRAMB,
                    Defendants.

**MEMORANDUM
OPINION & ORDER**

11 Civ. 4665 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This is a putative class action brought on behalf of purchasers of Defendant Avon

Products, Inc.'s common stock between July 31, 2006 and October 26, 2011 (the "Class

Period"). According to the Amended Complaint, Avon and two members of its senior

management – Andrea Jung and Charles W. Cramb – issued materially false and misleading

statements concerning Avon's compliance with the Foreign Corrupt Practices Act ("FCPA") of

1977, 15 U.S.C. § 78dd-1 et seq., on multiple occasions during the Class Period. (Am. Cmplt.

("Cmplt.") (Dkt. No. 29) ¶ 2) Plaintiffs bring claims under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 and Rule 10b-5. Defendants have moved to dismiss the

Amended Complaint, arguing that the challenged statements are non-actionable; that Plaintiffs

have not pled particularized facts supporting a strong inference that Defendants acted with

scienter; that Plaintiffs have not adequately alleged loss causation; and that Plaintiffs' claims are

untimely. (Dkt. No. 36; Def. Br. (Dkt. No. 37)) For the reasons stated below, Defendants'

motion will be granted.

# BACKGROUND[1]

Avon is a "leading global beauty company" based in New York City.  (Cmplt. ¶¶ 2, 21)  Its common shares are traded on the New York Stock Exchange.  (Id. ¶ 21)  The company markets its cosmetics products to women in more than 100 countries, primarily through a "direct selling" business model.  (Id. ¶¶ 5, 21)  Under this model, Avon hires independent promoters to sell products directly to consumers, rather than relying on sales in fixed locations such as retail stores.  (Id. ¶¶ 5, 21, 30, 32)  Avon employs approximately 6.5 million of these promoters – "Avon Sales Representatives" – worldwide.   (Id. ¶ 21)

Much of Avon's success over the past decade has been attributed to the growth of sales in so-called "developing markets" – particularly China and Latin America.  (Id. ¶ 26)  In April 2005, Avon was able to expand its sales in China significantly when it was one of the first companies to be granted a limited license to use direct selling – which had previously been banned in China – to sell its products there.  (Id. ¶¶ 32-33)  In March 2006, Avon was granted a permanent direct selling license, ensuring that the company could continue to employ its preferred business model in China on a long-term basis.  (Id. ¶ 33)

In an October 20, 2008 press release, Avon announced that it had received credible allegations that violations of the FCPA had occurred in connection with its Chinese operations.  (Id. ¶¶ 65, 69)  Avon stated that it was conducting an internal investigation and had voluntarily alerted the Department of Justice ("DOJ") and the Securities and Exchange

---

[1]  The Court's statement of facts is drawn from the Complaint's factual allegations, which are presumed to be true for purposes of this motion.  In deciding a motion to dismiss, a Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Commission ("SEC") to the allegations.  (Id. ¶¶ 65, 245)  Over the next two days, Avon's stock price declined 12%.  (Id. ¶ 247)  The October 20, 2008 press release was the first in a series of announcements by Avon relating to potential FCPA violations.  Those announcements culminated several years later in an October 27, 2011 statement disclosing that the SEC had opened a formal investigation of Avon and had issued a subpoena for information about bribes that Avon or its representatives had allegedly paid to Chinese officials.  (Id. ¶ 319)  After the October 27, 2011 announcement, Avon's stock price dropped nearly 18%.  (Id. ¶ 320)

Plaintiffs allege that Avon; its former Chief Executive Officer, Andrea Jung; and its former Chief Financial Strategy Officer, Charles W. Cramb, violated the Securities Exchange Act through a series of false statements and omissions of material fact about Avon's compliance with the FCPA and the success of its operations in international markets – particularly in China and Latin America – which was attributed to legitimate business strategies, rather than to the bribery of foreign officials.  (Id. ¶ 2)  The alleged Class Period begins on July 31, 2006 – when Defendants issued what Plaintiffs assert were misleading public filings concerning Avon's success in China due to direct selling, at a time when Defendants allegedly knew that Avon's direct selling licenses had been obtained through paying bribes – and ends on October 26, 2011, the day before the announcement concerning the SEC's formal investigation of Avon and its issuance of the subpoena.  (Cmplt. ¶¶ 1-2, 185-86, 319)

The 164-page Amended Complaint alleges that Defendants' false statements of material fact and omissions of material fact include the following:

(a) Avon's ethics codes and responsibility reports that lauded a commitment to high ethical and legal standards when, in reality, its compliance programs were inadequate and Defendants knew or recklessly disregarded information about bribes that Avon employees were making to foreign officials;

3

    (b) Avon's financial disclosures that attributed its success in developing markets to legitimate business strategies – specifically direct selling – without disclosing that such success was made possible through the bribery of foreign officials and that such bribery exposed Avon to significant penalties; and

    (c) Avon's announcements that discussed its legal compliance and its internal investigation into the FCPA allegations without disclosing that its actual compliance efforts were "woefully inadequate and, in many respects, virtually nonexistent."

(Id. ¶¶ 182-84)

## I.    <u>FACTUAL BACKGROUND</u>

Experiencing declining sales in the United States, Avon decided in about 2004-05 to expand its sales activities in international markets, with a focus on "developing markets" such as China and Latin America.  (Id. ¶¶ 25, 26)  China was a significant target for Avon, because it is one of the largest markets worldwide for cosmetics products.  (Id. ¶ 27)

Avon faced a significant obstacle to expanding its business in China, however:  a ban on direct selling that had been in place since 1998.  (Id. ¶ 30)  Avon was initially limited to pursuing sales in China through other sales methods, such as retail stores.  (Id. ¶ 67)  Because Avon's primary business model is premised on direct sales to customers, its ability to engage in direct selling in China was crucial to its success.  (Id. ¶¶ 30, 31)

To facilitate its expansion into the Chinese market, Avon sought the Chinese government's permission to engage in direct selling.  (Id. ¶ 31)  On April 8, 2005, Avon announced in a Form 8-K and in an accompanying press release that it had obtained government approval to test direct selling in three regions of China.  (Id. ¶ 32)

In September 2005, the Chinese government reportedly adopted a new law that would lift the ban on direct selling, effective December 1, 2005.  (Id.)  On February 22, 2006, the Chinese Ministry of Commerce announced that it had approved an application from Avon to engage in direct selling on a permanent basis and granted certificates to seven Avon employees

to train door-to-door vendors. (Id.) As a result of these actions, Avon became the first company

to engage in direct sales in China after the ban was lifted. (Id.)

According to Plaintiffs, China's "about-face" on direct selling – which permitted

Avon to obtain its licenses and employ its business model there – was the product of bribes that

Avon and its employees paid to Chinese officials, in the form of travel and entertainment

expenditures, as well as cash. (Id. ¶¶ 33, 67, 72) Plaintiffs allege that a 2005 internal audit

report revealed that Avon employees in China may have provided hundreds of thousands of

dollars in bribes to Chinese government officials, and that this report was sent to certain senior

Avon executives in New York no later than June 2006. (Id. ¶ 82, 129) Plaintiffs also claim that

Avon's practice of paying bribes to government officials was not limited to China, but extended

to other developing markets as well. (Id. ¶ 73)

On July 31, 2006, Avon filed a Form 10-Q and a Form 8-K, in which it reported

that Avon's total revenue in China had increased in the second quarter of 2006, "as the

commencement of direct selling more than offset the unfavorable impact of the exit of the

company-run beauty counters." (Id. ¶¶ 185, 186) In connection with the Form 10-Q, Jung and

Cramb signed and filed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX

Certifications").[2] (Id. ¶ 188)

---

[2] The SOX Certifications contain the following language:

1. I have reviewed this quarterly report on Form 10-Q of Avon Products, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of
   a material fact or omit to state a material fact necessary to make the statements
   made, in light of the circumstances under which such statements were made,
   not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial
   information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

On October 27, 2006, Avon filed a Form 10-Q for the next quarter, in which it

stated that

> (i) "[its] business in China continue[d] to evolve with the opening of direct
> selling"; (ii) "total . . . revenue [from China] increased in the third quarter of
> 2006, as the continued rollout of direct selling more than offset the unfavorable
> impact of the company-owned store counters"; and (iii) "direct selling [was]
> becoming a greater portion of [its] [Chinese] business and [was] expected to
> continue to do so as [Avon] continue[d] to build the direct-selling business."

(Id. ¶ 195)  Jung and Cramb again submitted SOX Certifications with this form.  (Id. ¶ 197)

That same day, Jung told analysts during a quarterly earnings call that

> [t]o our knowledge [Avon] remain[s] the only company in China with a national
> direct selling license.  This is a unique window, a once in a lifetime opportunity.
> We are moving to capitalize on this opportunity as aggressively as possible.
> China continues to have the potential to become one of the largest markets in
> Avon.

(Id. ¶ 198)

On February 6, 2007, Avon filed a Form 8-K, in which it reported that

"'[r]evenue in China grew 28% . . . reflecting further expansion of the company's direct selling

business.'"  (Id. ¶ 201)  On an analyst call that day, Jung similarly told analysts that, "turning to

China, fourth quarter revenue was up 28%, . . . as direct selling is clearly taking hold."  (Id.)

On February 28, 2007, Avon filed a Form 10-K that was signed by both Jung and

Cramb.  (Id. ¶ 203)  Avon reported that "'[t]otal revenue [in China] increased in 2006, as

significant growth in direct selling more than offset the lower revenue from beauty

boutiques.' . . . '[D]ue to the significant growth of direct selling since our March 2006 launch,

direct selling is becoming a greater portion of our business and is expected to continue as it is

built up.'"  (Id. (emphasis omitted))  Avon reported that revenue in Latin America had increased

---

(Cmplt. ¶ 189)

as well, "'reflecting growth in Active Representatives and units sold, as well as favorable foreign exchange, primarily in Brazil.'" (Id.) Jung and Crumb signed accompanying SOX certifications. (Id. ¶ 206)

On May 1, 2007, Avon filed its first quarter Form 10-Q, in which it reported that "'[r]evenue in China increased significantly during the first quarter of 2007 due to the continued roll-out of direct selling.'" (Id. ¶ 207) Jung and Cramb signed accompanying SOX certifications. (Id. ¶ 209) In an analyst call that day, Jung stated that she was "'not prepared to discuss how [Avon's] competitors [were] doing their business. . . . [W]e are abiding by the regs, which we believe are the same regs for all parties. We have not seen impact from direct selling competition. . . . [W]e continue to believe that China is going to be a big success for this company.'" (Id. ¶ 210 (emphasis omitted))

On July 31, 2007, Avon filed its second quarter Form 10-Q, which states that Avon "'continued to experience strong growth in emerging and developing markets . . . Revenue in China increased significantly . . . due to the continued roll-out of direct selling.'" (Id. ¶ 212 (emphasis omitted)) Jung and Cramb submitted accompanying SOX certifications. (Id. ¶ 216) A Form 8-K filed that day states that "'[r]evenue in China grew 36% (30% in local currency), reflecting continued expansion of the company's direct-selling business.'" (Id. ¶ 213) In a quarterly earnings call, Jung reported that "'revenue grew 36% [in China] . . . as the number of direct selling sales promoters climbed to nearly 660,000.'" (Id. ¶ 217)

On October 30, 2007, Avon filed its third quarter Form 10-Q, reporting that "'[r]evenue in China increased significantly . . . due to the continued roll-out of direct selling." (Id. ¶ 219) Jung and Cramb submitted SOX certifications with the form. (Id. ¶ 222) On a quarterly earnings call that day, Jung stated that "'in terms of the strength of [Avon's] business

8

model in China, I am very pleased that our beauty boutiques are stable and that the hybrid model of beauty boutiques and sales promoters continues to give Avon a competitive advantage."[3]  (Id. ¶ 220)

On February 5, 2008, Avon issued a Form 8-K, announcing that "'[r]evenues in China grew 29% . . . Active Representatives were up 73% year over year.'"  (Id. ¶ 223)

On February 21, 2008, Avon filed its annual report for 2007 on a Form 10-K.  (Id. ¶ 229)  Both the report and accompanying SOX certifications were signed by Jung and Cramb.  (Id. ¶¶ 229, 233)  The report states that "'[t]otal revenue in China increased significantly in 2007, primarily due to an increase in Active Representatives reflecting further expansion of the direct selling business, which contributed over one half of the region's revenue in 2007.'"  (Id. ¶ 229)  In Latin America, "'[t]otal revenue increased during 2007, driven by growth in Active Representatives.'"  (Id. ¶ 230)

On April 29, 2008, Avon filed a Form 10-Q, in which it reported that "'[t]otal revenue in China increased significantly in the first quarter of 2008, primarily due to an increase in Active Representatives. . . . The growth in Active Representatives reflects continued expansion of our direct selling efforts.'"  (Id. ¶ 234 (emphasis omitted))  SOX certifications signed by Jung and Cramb were submitted with the form.  (Id. ¶ 237)  A Form 8-K filed that day similarly reports that "'[r]evenue in China grew 29% (19% in local currency) and . . . Active Representatives were up 99% year over year.'"  (Id. ¶ 235)  On a quarterly earnings call, Jung told analysts that "given the government regulations and the continued opportunity, . . . we

---

[3]  While not clearly explained in the Complaint, it appears that Avon continued to conduct at least some of its sales in China through retail stores even after obtaining its permanent direct selling license.  Avon referred to its method of selling through both retail stores and direct selling as the "hybrid model."  (See, e.g., Cmplt. ¶ 220)

9

continue to evaluate the long-term strategy of China. . . . I would just say it's a fluid environment and we're very pleased with what we're doing here." (Id. ¶ 238)

On July 30, 2008, Avon filed a Form 10-Q stating that "'[r]evenue in China increased for both the three and six-month periods of 2008, primarily due to an increase in Active Representatives. . . . The growth in Active Representatives reflects continued expansion of our direct selling efforts.'" (Id. ¶ 240 (emphasis omitted))  SOX certifications signed by Jung and Cramb were submitted with the form. (Id. ¶ 244)  On a quarterly earnings call, Jung attributed Avon's success to its "attractive business model," and Cramb told analysts that Avon was "'very pleased with [its] business model in China right now in terms of the way [it] operate[s].'" (Id. ¶¶ 241-42 (emphasis omitted))

Avon's first bribery-related disclosure took place on October 20, 2008, when the Company issued a press release and Form 8-K stating that Jung had received a letter in June 2008 from a whistleblower who made credible allegations that certain travel and entertainment expenses connected to Avon's Chinese operations may have violated the FCPA. (Id. ¶¶ 65, 66, 245, 246)  Avon announced that it had initiated an internal investigation to be conducted by outside counsel under the oversight of the Audit Committee of the Company's Board of Directors, and that it had voluntarily alerted the SEC and the DOJ to the potential violations. (Id. ¶ 66)

An October 31, 2008 article in the Wall Street Journal reported that "the Chinese government had 'detained officials involved in licensing foreign companies to operate in China, in what appear[ed] to be a widening corruption probe that ha[d] touched most obviously on the direct-selling business,'" and noted that these arrests "came 'at a time when [Avon] sa[id] it may have found improprieties in its operations in the country.'" (Id. ¶¶ 69, 70)

10

Following these announcements, Avon's stock price declined 2.75% between October 20, 2008 and October 21, 2008, and fell another 9.3% between October 21, 2008 and October 22, 2008. (Id. ¶ 247)

On October 30, 2008, Avon filed a Form 10-Q that reiterated its October 20, 2008 announcement of the internal investigation. (Id. ¶ 250) Avon stated that "[b]ecause the internal investigation [was] in its early stage, [it] [could not] predict how the resulting consequences, if any, m[ight] impact [its] internal controls, business, results of operations or financial position." (Id.) Jung and Cramb signed accompanying SOX certifications. (Id. ¶ 252) Jung also told analysts on an earnings call that "'[i]n China, revenue in the third quarter increased 25%, 13% in local currencies, with active representatives nearly doubling versus a year ago, and these results reflected [Avon's] continued strategic investments in this important market.'" (Id. ¶ 253)

On February 3, 2009, Avon filed a Form 8-K and accompanying press release, in which Jung stated that Avon believed its "model [was] well suited to create income opportunities in these difficult economic times. . . . We have a solid balance sheet, an operating model that generates healthy cash flow and a continued commitment to our dividend. This strong foundation, coupled with . . . the competitive advantages of our direct selling business model, gives us confidence. . . ." (Id. ¶ 254) In a quarterly earnings call that day, Jung also stated that "'[a]nother bright spot in [Avon's] portfolio in the quarter was China, where revenue in local currency grew 17%. Active representatives grew 88%. The number of certified sales promoters in China [was] . . . almost 1 million.'" (Id. ¶ 256 (emphasis omitted))

On February 20, 2009, Avon filed a Form 10-K for 2008, which was signed by Jung and Cramb. (Id. ¶ 258) In this form, Avon again reiterated its earlier statements about the internal investigation. (Id.) Avon also reported that "'[r]evenue in China increased for 2008,

11

primarily due to an increase in Active Representatives, partially offset by a lower average order. The growth in Active Representatives reflected continued expansion of our direct selling efforts, which were supported with significant Representative recruiting, television advertising and field incentives.'" (Id. ¶ 259 (emphasis omitted))  With respect to Latin America, Avon stated that "'[t]otal revenue increased for 2008, driven by a larger average order and growth in Active Representatives, as well as favorable foreign exchange.'" (Id. ¶ 261)  Jung and Cramb submitted SOX Certifications in connection with this filing.  (Id. ¶ 262)

On May 5, 2009, Avon filed a Form 10-Q, repeating its prior statements about its investigation and stating that in China "'[r]evenue increased in the first quarter of 2009. . . . The growth in Active Representatives reflect[ed] continued expansion of [its] direct selling efforts, which were supported with continued Representative recruiting, television advertising and field incentives.'" (Id. ¶¶ 264-65)  Jung and Cramb submitted SOX Certifications with the form.  (Id. ¶ 266)  In discussing sales in China during a quarterly earnings call, Jung reported that Avon was "'continu[ing] to bring in over 40,000 new sales promoters each month.  Active representatives in this market were up over 40% in the quarter.  [Avon] . . . ha[d] almost 0.5 million active representatives in China.  So the direct selling business in this market remain[ed] healthy and growing.'"  (Id. ¶ 267 (emphasis omitted))

On July 30, 2009, Avon stated in a Form 10-Q that its investigation of FCPA violations had expanded to additional countries and reiterated that "'[b]ecause the internal investigation [was] ongoing, [Avon] [could not] predict how the results of the investigation m[ight] impact [its] internal controls, business, and results of operations or financial condition.'" (Id. ¶ 272 (emphasis omitted))  Jung and Cramb submitted SOX certifications with the form.  (Id. ¶ 274)  In a press release accompanying a Form 8-K that day, Avon reported that revenue in

China had grown because its "'bold strategies to counter the recession [were] working. [Avon] had] been successful at gaining Representatives and consumers during these tough economic times. This confirm[ed] [Avon's] belief in the inherent advantage of [its] direct-selling business model.'" (Id. ¶ 275 (emphasis omitted)) Jung also stated in a call with analysts that she thought they could "continue to look at China as a major growth driver for the corporation" and that "'the double-digit growth that [Avon was] seeing [was] certainly being driven by strength in direct sales.'" (Id. ¶¶ 277-78)

On October 29, 2009, Avon filed a Form 10-Q with accompanying SOX Certifications signed by Jung and Cramb. (Id. ¶¶ 280-81) Disclosures regarding Avon's internal investigation were identical to those in its previous 10-Q. (Id. ¶ 280)

On February 25, 2010, Avon filed its annual report for 2009 on a Form 10-K with accompanying SOX Certifications, both of which were signed by Jung and Cramb. (Id. ¶¶ 282, 284) In this report, Avon states:

> We are investigating Foreign Corrupt Practices Act (FCPA) and related U.S. and foreign law matters, and from time to time we may conduct other internal investigations and compliance reviews, the consequences of which could negatively impact our business.
>
> From time to time, we may conduct internal investigations and compliance reviews, the consequences of which could negatively impact our business. Any determination that our operations or activities are not in compliance with existing United States or foreign laws or regulations could result in the imposition of substantial fines, interruptions of business, termination of necessary licenses and permits, and other legal or equitable sanctions. Other legal or regulatory proceedings, as well as government investigations, which often involve complex legal issues and are subject to uncertainties, may also follow as a consequence. It is our policy to cooperate with U.S. and foreign government agencies and regulators, as appropriate, in connection with our investigations and compliance reviews.
>
> As previously reported, we have engaged outside counsel to conduct an internal investigation and compliance reviews focused on compliance with the FCPA and related U.S. and foreign laws in China and additional countries. The internal

13

investigation and compliance reviews, which are being conducted under the
oversight of our Audit Committee, began in June 2008.  We voluntarily contacted
the United States Securities and Exchange Commission and the United States
Department of Justice to advise both agencies of our internal investigation and
compliance reviews and we are, as we have done from the beginning of the
internal investigation, continuing to cooperate with both agencies and have signed
tolling agreements with them.

The internal investigation and compliance reviews, which started in China, are
focused on reviewing certain expenses and books and records processes,
including, but not limited to, travel, entertainment, gifts, and payments to third-
party agents and others, in connection with our business dealings, directly or
indirectly, with foreign governments and their employees.  The internal
investigation and compliance reviews of these matters are ongoing.  At this point
we are unable to predict the duration, scope or results of the internal investigation
and compliance reviews.

Any determination that our operations or activities are not in compliance with
existing laws or regulations could result in the imposition of substantial fines,
civil and criminal penalties, equitable remedies, including disgorgement,
injunctive relief and other sanctions against us or our personnel.  In addition,
other countries in which we do business may initiate their own investigations and
impose similar sanctions.  Because the internal investigation and compliance
reviews are ongoing, there can be no assurance as to how the resulting
consequences, if any, may impact our internal controls, business, reputation,
results of operations or financial condition.

(Id. ¶ 282 (emphasis omitted))

On April 13, 2010, Avon confirmed to the Wall Street Journal that it had

suspended four employees – three in Asia and one in New York – in connection with its internal

investigation. (Id. ¶ 285)  As a result, Avon's share price dropped 8%.  (Id.)

On April 30, 2010, Avon filed a Form 10-Q, stating that

[w]e are conducting these compliance reviews in a number of other countries
selected to represent each of the Company's four other international geographic
segments.  The internal investigation and compliance reviews are focused on
reviewing certain expenses and books and records processes, including, but not
limited to, travel, entertainment, gifts, and payments to third-party agents and
others, in connection with our business dealings, directly or indirectly, with
foreign governments and their employees.  The internal investigation and
compliance reviews of these matters are ongoing, and we continue to cooperate
with both agencies with respect to these matters.  At this point we are unable to

14

predict the duration, scope, developments in, results of, or consequences of the internal investigation and compliance reviews.

(Id. ¶ 287 (emphasis omitted))  Jung and Cramb submitted SOX Certifications with this

form.  (Id. ¶ 288)

In an earnings call that day, Jung provided additional details about the

investigation:

I just wanted to begin my remarks this morning with some comments about China, which I know is top of mind for many of you.  I'll talk specifically about our business performance.  But first I just want to share my perspective on our FCPA investigation in that market.  Given that this is an ongoing investigation and the facts are still under review we're limited, as you well know, in what we can say.  But I want to be as responsive as I can and recap the status of our investigation to the extent possible.

Avon disclosed in October 2008 that an allegation had been made about possible FCPA violations in our China business relating to travel, entertainment and other expenses.  The allegation came in the form of a letter written directly to me.  As you would expect, I immediately turned the information over for proper handling and we began an internal investigation under the oversight of our audit committee and conducted by outside counsel.  Most importantly, we voluntarily self-reported the allegation to the United States Securities and Exchange Commission, as well as the Department of Justice.  And again, this was voluntary.

China is a unique and highly regulated market with its own specific requirements.  Nevertheless, as a company that holds leadership positions in developing and emerging markets, we are also conducting compliance reviews related to FCPA in additional countries.  We disclosed this in July 2009.

I want to clarify that we are conducting these compliance reviews in a selection of markets representing each of our 4 international business units outside of China.  I also want to emphasize again that the allegation that triggered our investigation was in China only.  Conducting compliance reviews in these additional markets is the appropriate thing to do in investigations of this type and as we stated, we've been cooperating with both governmental agencies.

Three weeks ago, as you know, 4 associates were placed on administrative leave specifically in connection with the China investigation.  The decision to put people on administrative leave does not reflect any outcome from the investigation.  Given this and given that the associates are not senior executive level officers of the company, we did not file a disclosure and name the names.  So that's where we are in terms of FCPA.  No conclusions can be drawn at this

15

> time. And as I said, the investigation has been going on since 2008. We've seen very little management distraction and I'm pleased that from what I can see, everyone all around the world is focused on running the business as we want them to be.

(Id. ¶ 290 (emphasis omitted))

On July 29, 2010, Avon filed a Form 10-Q that reiterated the previous Form 10-Q's disclosure regarding the internal investigation. (Id. ¶ 293) Jung and Cramb submitted SOX Certifications with this form. (Id. ¶ 295)

Before the market opened on October 28, 2010, Avon filed a Form 10-Q disclosing that Avon's sales "had plunged 31% in China, with units sold down 28% and Active Representatives down 36%." (Id. ¶ 296) Avon attributed this decline in revenue to its "hybrid business model" in China, and represented that its "'continued transition away from [the] complex hybrid business model to one which focuses on direct selling and updating our service center model, is expected to include a realigned field compensation structure and recalibrated merchandising and campaign management strategies to support direct selling.'" (Id.) The report also reiterated the language of the prior Form 10-Q regarding Avon's ongoing investigation. (Id. ¶ 299) Jung and Cramb submitted SOX Certifications with this filing. (Id. ¶ 301) In a quarterly earnings call that day, Cramb referred to the FCPA investigation as "'a significant cost that [Avon] never anticipated.'" (Id. ¶ 302)

In response to the October 28, 2010 announcements, Avon's share price declined 5.6%. (Id. ¶ 297)

Before the market opened on February 8, 2011, Avon released a Form 8-K reporting that "'[f]ourth-quarter revenue in China decreased 45% year over year. . . . The region's revenues continued to be impacted by the company's planned transition away from a

hybrid model to one which focuses on direct selling.  Units sold decreased 44% and Active

Representatives were down 68%.'" (Id. ¶ 303)

On February 24, 2011, Avon filed a Form 10-K for 2010 – signed by and

accompanied by a SOX Certification from Jung and Cramb (id. ¶ 308) – which repeated its

earlier disclosures and described additional developments regarding Avon's internal

investigation:

> The internal investigation and compliance reviews of these matters are ongoing,
> and we continue to cooperate with both agencies with respect to these matters.  At
> this point we are unable to predict the duration, scope, developments in, results of,
> or consequences of the internal investigation and compliance reviews.
>
> Any determination that our operations or activities, including our licenses or
> permits, importing or exporting, or product testing or approvals are not in
> compliance with existing laws or regulations could result in the imposition of
> substantial fines, civil and criminal penalties, interruptions of business,
> modification of business practices and compliance programs, equitable remedies,
> including disgorgement, injunctive relief and other sanctions that we may take
> against our personnel or that may be taken against us or our personnel.  In
> addition, pending the outcome of these matters, certain personnel actions have
> been taken, including the placing of the Senior Vice President, Western Europe,
> Middle East & Africa, Asia Pacific and China on administrative leave in
> connection with the internal investigation relating to our China operations, and
> additional personnel actions may be taken in the future.  Further, other countries
> in which we do business may initiate their own investigations and impose similar
> sanctions.  Because the internal investigation and compliance reviews are
> ongoing, there can be no assurance as to how the resulting consequences, if any,
> may impact our internal controls, business, reputation, results of operations or
> financial condition.

(Id. ¶ 306)

On May 3, 2011, Avon revealed in its Form 10-Q that "'[i]n connection with the

internal investigation, certain personnel actions have been taken, including the termination of

four individuals previously placed on administrative leave in 2010 . . . Pending the outcome of

the internal investigation and compliance reviews, additional personnel actions may be taken in

the future." (Id. ¶ 310)  SOX certifications from Jung and Cramb were submitted with the form. (Id. ¶ 313)

On May 4, 2011, the Wall Street Journal reported that Avon's internal investigation had uncovered more potential bribery in China, as well as in Brazil, Mexico, Argentina, India, and Japan.  (Id. ¶ 314)

Between May 3, 2011 and May 5, 2011, Avon's share price dropped 7.1%.  (Id. ¶ 315)

On May 23, 2011, Avon announced that Cramb would no longer serve as CFSO when his replacement, Kimberly A. Ross, joined Avon in the fall of 2011.  (Id. ¶ 77)

On May 24, 2011, the Wall Street Journal reported that federal prosecutors were actively investigating possible FCPA violations at Avon and seeking information about the role of some former senior officials at Avon's New York headquarters.  (Id. ¶¶ 80, 316)

On May 25, 2011, Avon's share price fell 2.7%.  (Id. ¶ 316)

On July 28, 2011, Avon filed a Form 10-Q with accompanying SOX certifications signed by Jung and Cramb that again repeated Avon's earlier disclosures regarding the internal investigation.  (Id. ¶¶ 317, 318)

On October 27, 2011, Avon disclosed in a Form 10-Q that the SEC had opened a formal investigation of Avon:

> On October 26, 2011, the Company received a subpoena from the [SEC] requesting documents and information in connection with a Regulation FD investigation of the Company's contacts and communications with certain financial analysts and other representatives of the financial community during 2010 and 2011. The Company was also advised that a formal order of investigation was issued by the SEC relating to the FCPA matters described [previously] and the Regulation FD matters that are referenced in the subpoena. The Company intends to cooperate fully with the SEC's investigation.

(Id. ¶ 319)

18

After this disclosure, Avon's share price dropped almost 18%.  (Id. ¶ 320)

On December 14, 2011, Avon announced that Jung would step down as CEO but would remain Avon's Executive Chairwoman for two years.  (Id. ¶ 340)

On January 30, 2012, Avon announced in a Form 8-K that Cramb had been terminated in a "personnel action" that was taken "on January 29, 2012, in connection with the Company's previously disclosed internal investigation and the Regulation FD matter."  Avon Products, Inc., FORM 8-K (Jan. 30, 2012), available at http://www.sec.gov/Archives/edgar/data/8868/000000886812000002/item502.htm (last accessed Sept. 27, 2014); (see Cmplt. ¶ 78).  The Wall Street Journal reported that Mr. Cramb was fired "in connection with probes into possible bribery overseas and improper disclosures to Wall Street analysts in the U.S."  Joe Palazzolo & Joann S. Lublin, Avon Fires Vice Chairman, WALL ST. J., Jan. 31, 2012, available at http://online.wsj.com/news/articles/SB10001424052970204652904577193550538605694.  The Journal went on to state that the "personnel action" was taken "after indications emerged that he had been aware of possible corruption involving foreign officials in China as early as the middle of the last decade."  (Id.)

On February 13, 2012, Reuters reported that prosecutors were investigating whether Avon "'continued to provide meals and entertainment for low-level Chinese ministers after 2005."  (Id. ¶ 80)  The Wall Street Journal also reported that day that federal prosecutors investigating bribery allegations against Avon had presented evidence to a grand jury, and that "'[t]he Federal Bureau of Investigation and U.S. prosecutors in New York and Washington [were] trying to determine whether current or former executives ignored the . . . [findings of a

2005 internal audit report regarding bribery in China] or actively took steps to conceal the problems.'" (Id. ¶ 82)

## II.    PROCEDURAL HISTORY

On July 6, 2011, this putative securities fraud class action was filed on behalf of investors in Avon common stock during the Class Period. (Dkt. No. 1)  On September 29, 2011, this Court appointed Lead Plaintiff and Lead Counsel. (Dkt. No. 21)  The Amended Class Action Complaint was filed on March 16, 2012. (Dkt. No. 29)  Defendants filed their motion to dismiss on October 12, 2012. (Dkt. No. 36)

## DISCUSSION

## I.    LEGAL STANDARD

### A.    Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507

F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

As noted above, "[i]n considering a motion to dismiss for failure to state a claim

pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint,

documents attached to the complaint as exhibits, and documents incorporated by reference in the

complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing

Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau,

180 F.3d 42, 54 (2d Cir. 1999)).  Moreover, "[w]here a document is not incorporated by

reference, the court may never[the]less consider it where the complaint 'relies heavily upon its

terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting

Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).  A court may also consider

"legally required public disclosure documents filed with the SEC." ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

## B.   Securities Fraud Complaints

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities

Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig.,

857 F. Supp. 2d 367, 383 (S.D.N.Y. 2010).  First, the complaint must satisfy Federal Rule of

Civil Procedure 9(b), which requires that "a party . . . state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b).  "Second, the complaint must meet the pleading

requirements of the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-4(b)."

Id.

The heightened pleading requirement under Rule 9(b) "serves to provide a

defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident

charges of wrongdoing, and protect him against strike suits." ATSI Communications, Inc., 493

F.3d at 99. Thus, a securities fraud complaint based on misstatements must "'(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent.'"

Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp.,

12 F.3d 1170, 1175 (2d Cir. 1993)).

Moreover, under the PSLRA, a plaintiff must "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §

78u-4(b)(2); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The

PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged

violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive,

manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976))). "To

qualify as 'strong' within the intendment of [the PLSRA], . . . an inference of scienter must be

more than merely plausible or reasonable – it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o

determine whether a complaint's scienter allegations can survive threshold inspection for

sufficiency, a court governed by [the PLSRA] must engage in a comparative evaluation; it must

consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally

drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would

deem the inference of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged." Id. at 324.

I.   **STATEMENTS IN AVON'S ETHICS CODES**
     **AND CORPORATE RESPONSIBILITY REPORTS**

Among the more than sixty statements cited in the Amended Complaint that

Plaintiffs claim are "materially false and misleading" are statements taken from Avon's (1) 2004

and 2008 Code of Business Conduct and Ethics (the "Ethics Code"); and (2) 2004 and 2009

Corporate Responsibility Reports.[4]   (Cmplt. ¶¶ 191-94, 225-28, 269-71)

The 2004 Ethics Code states that "'[o]ne of Avon's fundamental principles is that

its associates will observe the very highest standards of ethics in the conduct of Avon's business,

so that even the mere appearance of impropriety is avoided.'" (Id. ¶ 56 (emphasis omitted))  It

also provides that "'[e]ach Avon associate is responsible for complying with all laws and

regulations that apply to his or her work, for adhering to the specific provisions and spirit of this

Code, and for avoiding even the appearance of improper conduct.'" (Id. (emphasis omitted))

The 2004 Ethics Code notes that

> [t]he Foreign Corrupt Practices Act prohibits Avon from offering or paying any
> money or other thing of value, directly or indirectly to any foreign government
> official, foreign political party or its officials, or candidate for public office, for
> the purpose of improperly obtaining or maintaining business or influencing
> governmental action favorable to Avon.  Such prohibited payments include
> consulting, broker's, finder's or other fees paid to third parties where there is
> reason to believe that any part of such fees will be distributed to, or for the benefit
> of, foreign officials or political parties for those improper objectives.

---

[4] Although Avon issued the 2004 Ethics Code and 2004 Corporate Responsibility Report before
the start of the class period, courts in this District have found that this alone does not require
dismissal.  See Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 236-37 (S.D.N.Y. 2006)
("Defendants argue that the statements . . . fall outside the Class Period and are therefore not
actionable. . . . Defendants are correct in noting that they are 'liable only for those statements
made during the class period.' . . . However, even under this standard, a complaint's inclusion of
statements made before the class period does not require dismissal when they are 'relevant in
determining whether defendants had a duty to make a corrective disclosure during the Class
Period.'" (quoting In re IBM Corporate Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998)); In re
Quintel Entm't Inc. Sec. Litig., 72 F. Supp. 2d 283, 290-91 (S.D.N.Y. 1999)).

(Id. ¶ 58)  The 2004 Code also states that "'[b]ribes, kickbacks and payoffs to government officials, suppliers and other[s] are strictly prohibited'" and that "'[n]o gift, entertainment or favor of any kind may be given to any government employee without the prior approval of the Legal Department or officer in charge of legal affairs in your country.'"  (Id. ¶ 59 (emphasis omitted))

The 2008 Ethics Code contains the same language.  (Id. ¶ 61)

Avon's 2004 Corporate Responsibility Report includes the following message from Jung regarding Avon's corporate ethics:

> For more than a century, Avon has demonstrated a deep commitment to empowering women and a strong belief in the importance of corporate responsibility.  This echoes the core principles that our founder, David H. McConnell, set forth when he established the company in 1886.  These principles still live on in every aspect of our business today.
>
> . . . .
>
> In today's increasingly complex business environment, corporate integrity has become a key barometer for a company's success.  To that end, Avon continues to adhere to the highest standards of integrity, ethical conduct and good corporate citizenship.
>
> . . . .
>
> Avon remains dedicated to the goals of our founder, who believed in meeting "fully the obligations of corporate citizenship by contributing to the well-being of society and the environment in which it functions.

(Id. ¶ 62 (emphasis omitted) (omissions in Cmplt.))  According to Plaintiffs, this report was "made available" to investors in 2004.  (Id. ¶ 193)

Avon's 2009 Corporate Responsibility Report emphasizes the company's commitment to

> compliance with all applicable laws, rules and regulations in every country in which we do business, including but not limited to those related to labor and employment; direct selling; product labeling; advertising; improper payments and

24

> bribery; and antitrust and competition.  Laws affecting the operation of our
> business in every country have grown in number and complexity.  It is expected
> that associates will have a working knowledge of permissible activities involved
> in their work.

(Id. ¶ 269 (emphasis omitted))  The 2009 report also includes the following statement

from Jung:

> As Avon associates, we all share a proud heritage of maintaining the highest
> standards of integrity and ethical conduct.  These values trace directly back to the
> premise upon which David McConnell founded this business more than a century
> ago.  And today, we hold steadfast to these values and principles because they are
> the bedrock not only of Avon's past, but of its future.

(Id. ¶ 270 (emphasis omitted))

Plaintiffs claim that these statements in Avon's Ethics Codes and Corporate

Responsibility Reports were materially false and misleading in that "Jung and Cramb were at

that time aware of and/or recklessly disregarded material weaknesses in Avon's system of

internal controls that were not disclosed to the investing public."  (Id. ¶ 194; see id. ¶¶ 228, 271)

"[I]n actuality, Avon was not 'strongly committed to a policy and practice of compliance with

both the letter and spirit of all applicable laws and regulations in each country in which [it] [did]

business.'"  (Id. ¶ 228; see id. ¶¶ 194, 271)

Defendants contend that "general statements of a company's commitment to high

standards of business performance or conduct are not actionable."  (Def. Br. (Dkt. No. 37) at 7)

"Under Section 10b and Rule 10b-5, a statement is only actionable if it is a

'statement of material fact.'"  Woodward v. Raymond James Fin., Inc., 732 F. Supp. 2d 425, 433

(S.D.N.Y. 2010) (quoting 17 C.F.R. § 240.10b-5).  "The materiality of a misstatement depends

on whether '"there is a substantial likelihood that a reasonable shareholder would consider it

important in deciding how to [act]."'"  ECA & Local 134 IBEW Joint Pension Trust of Chicago

v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quoting Basic Inc. v. Levinson, 485

25

U.S. 224, 231 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)))
(alteration in original).

"[S]tatements of puffery or mere generalizations are not material misstatements."
Woodward, 732 F. Supp. 2d at 433.  Such statements are not actionable as securities fraud
because investors do not rely on "generalizations regarding integrity, fiscal discipline and risk
management."  In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005)
(defendant's representations of "itself as an institution of integrity with sound risk-management
procedures . . . amount[ed] to no more than puffery") (citing Lasker v. N.Y. State Elec. & Gas
Corp., 85 F.3d 55, 59 (2d Cir. 1996) (statements that a company refused to "compromise its
financial integrity," that it had a "commitment to create earnings opportunities," and that these
"business strategies [would] lead to continued prosperity" constituted puffery)).  "Similarly,
statements of 'corporate optimism' do not give rise to securities violations because 'companies
must be permitted to operate with a hopeful outlook.'"  In re Ambac Fin. Grp., Inc. Sec. Litig.,
693 F. Supp. 2d 241, 272 n.35 (S.D.N.Y. 2010) (quoting Rombach, 355 F.3d at 174).

"The statements highlighted by Plaintiffs [here] are no more than 'puffery' [and
generalizations] which do[ ] not give rise to securities violations.  The statements are too general
to cause a reasonable investor to rely upon them."  ECA & Local 134 IBEW Joint Pension Trust
of Chicago, 553 F.3d at 206 (internal citation omitted).  "[M]ere[ ] generalizations regarding
[Defendants'] business practices . . . are 'precisely the type of "puffery" that this and other
circuits have consistently held to be inactionable.'"  Id. (quoting Lasker, 85 F.3d at 59).  Courts
in this Circuit have found statements similar to those in Avon's Ethics Codes and Corporate
Responsibility Reports – general statements proclaiming compliance with ethical and legal
standards -- to be non-material.  See id. ("[Defendant's] statement that it '"set the standard for

26

best practices in risk management techniques,'"... is so general that a reasonable investor would not depend on it as a guarantee that [defendant] would never take a step that might adversely affect its reputation. ... Finding that [defendant's] statements constitute a material misrepresentation would bring within the sweep of federal securities laws many routine representations made by ... institutions. We decline to broaden the scope of securities laws in that manner."); In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) ("The Court finds that the descriptions at issue here – that the compliance program was 'robust' or 'best-of-class' ... fall 'into the category of commonplace statements too general to cause reliance by a reasonable investor.'" (quoting In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011))); Gusinsky v. Barclays PLC, 944 F. Supp. 2d 279, 289 (S.D.N.Y. 2013), reconsideration denied (June 13, 2013), aff'd in part, vacated in part on other grounds, remanded sub nom., Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227 (2d Cir. 2014) (rejecting argument that statements regarding company's legal compliance effort were material where company was alleged to be actively violating laws; "[i]f this were sufficient, then every individual who purchased the stock of a company that was later discovered to have broken any law could theoretically sue for fraud") (emphasis in original); In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31, *36 (S.D.N.Y. Sept. 28, 2012) (general statements "concerning [defendant's] compliance with legal and ethical standards" were mere puffery where defendant did not "assert[ ] that its financial success was attributable to its adherence to laws or to a particular advantage it had over its peer institutions"); see also In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 413 n.15 (S.D.N.Y. 1998) (noting in dicta that "statements about [defendant's] 'culture,' 'cost controls,' 'integrity,' 'strategic planning,' and 'personal accountability' ... amount to mere puffery").

Here, a reasonable investor would not rely on the statements discussed above as a guarantee that Avon would, in fact, maintain a heightened standard of legal and ethical compliance. The aforementioned statements from the Ethics Codes and the Corporate Responsibility Reports offer no assurance that Avon's compliance efforts will be successful, and do not suggest that Avon's compliance systems give the Company a competitive advantage over other companies. See In re UBS AG Sec. Litig., 2012 WL 4471265, at *36. Instead, these statements merely set forth standards in generalized terms that Avon hoped its employees would adhere to. Such statements are not material.

Other statements in Avon's 2004 Corporate Responsibility Report, however, go beyond generalized expressions of commitment to high corporate standards, and address concrete steps that Avon has taken to ensure the integrity of its financial reporting. In the 2004 Corporate Responsibility Report, Avon states that it has

> a comprehensive and well-documented set of internal controls that provides reasonable assurance that [its] financial transactions are recorded accurately and completely, and [its] assets are safeguarded. It is management's responsibility to monitor the control environment through quarterly and annual self-assessments and independent monitoring from internal audit. In fact, every single financial reporting location participates in an annual internal control self-assessment and is asked to certify that their control environment is designed and operating efficiently.

> Sarbanes-Oxley legislation in the U.S. requires that CEOs and CFOs of publicly traded companies certify annually as to the effectiveness of their internal control over financial reporting. To fulfill this task, Avon created an internal team of global accounting and auditing professionals to work together to coordinate and assist Avon's worldwide associates in the identification, documentation, and review of over 12,000 internal controls across all markets and key functions. This first annual certification of 2004 controls was successfully completed in early 2005.

(Cmplt. ¶ 63) A reasonable investor could interpret Avon's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Avon had taken in this area,

and might rely upon these statements as a guarantee that such steps had, in fact, been implemented. See In re UBS AG Sec. Litig., 2012 WL 4471265, at *36 (distinguishing statements that were mere puffery from "qualitative assurances and affirmative guarantees regarding . . . specific steps [the Defendant] had taken to achieve particular results"). This Court does not find these statements to be non-material as a matter of law.

In sum, Avon's statements in the 2004 and 2008 Ethics Codes and the 2009 Corporate Responsibility Report, and Jung's message in the 2004 Corporate Responsibility Report, are not material, and Defendants' motion to dismiss claims related to these statements will be granted. The remaining statements from the 2004 Corporate Responsibility Report concerning Avon's elaborate internal controls regime are material but, as discussed below, claims related to those statements fail on other grounds.

## II. PLAINTIFFS HAVE NOT PLED FACTS SUFFICIENT TO DEMONSTRATE A STRONG INFERENCE OF SCIENTER WITH RESPECT TO STATEMENTS CONCERNING AVON'S BUSINESS SUCCESS

Most of the statements that Plaintiffs cite as materially false or misleading concern Avon's business success in China and other "developing markets." Plaintiffs do not claim that the statistics Avon reported were false, or that Avon was not experiencing the sales growth it indicated. Plaintiffs instead contend that Defendants' statements were misleading because they did not attribute Avon's success to the bribery of foreign officials or disclose "the significant risk that, once the full extent of Avon's illegal practices became known, the Company would be exposed to criminal and regulatory investigations, significant damage to reputation, and other losses and costs." (See Cmplt. ¶¶ 185, 186, 195, 198, 199, 201, 203, 207, 212, 213, 217, 219, 220, 223, 229, 230, 234, 235, 238, 240, 241, 242, 253, 254, 256, 259, 261, 265, 267, 275, 277, 278, 296)

29

"A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement." In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 677 (S.D.N.Y. 1990).  Under

> that portion of Rule 10b-5 requiring disclosure of additional facts 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading' . . . , even though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading.

Id. at 675.

"Accurate statements of past earnings figures are not themselves actionable under Section 10(b)." In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) (emphasis in original).  However, "a company's misleading statements about the sources of its revenue . . . [may make] the misleading statements themselves [actionable]." In re Marsh & McLennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) "'[A]lthough a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."'" Lapin, 506 F. Supp. 2d at 240 (quoting In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (quoting In re Providian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001))); see In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. at 675, 677-78 (denying motion to dismiss where "defendants' public disseminations touting [their] competitive advantage in obtaining speedy FDA approvals and . . . earnings performance were false and misleading because defendants[ ] failed to disclose . . . that such advantage was obtained through an illegal scheme of bribes rather than through defendants' expertise and business acumen"); such

30

statements could "convey[ ] to a reasonable investor the false impression that [defendants] had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies and that this advantageous expertise was responsible for its success"). Moreover, at least one court in this District has recognized, there "appear[s] to be some debate within this Circuit as to whether statements that put the sources of stated revenue at issue without revealing their actual improper source can render [even] the reports of revenue themselves actionably misleading." See In re FBR Inc. Sec. Litig., 544 F. Supp. 2d at 356 (citing In re Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d at 470 (noting that In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, "may be interpreted to hold that the statements which put the sources of revenue at issue triggered a general duty to disclose, thereby rendering all of the company's statements of its revenue figures misleading," but rejecting that proposition and finding that liability was "limited to the misleading statements themselves")).

Here, in virtually every financial disclosure during the Class Period, Defendants linked Avon's success (and later, lack of success) to its direct selling efforts in developing markets. If the success of direct selling was made possible – as Plaintiffs allege – by the bribery of foreign officials, then a reasonable fact finder could conclude that attributing Defendants' success to direct selling without disclosing the bribery scheme was misleading. These statements, therefore, could potentially be actionable if the other requirements to state a claim under Section 10(b) are satisfied.

Defendants argue that claims related to these statements must nonetheless be dismissed because the Amended Complaint does not plead facts sufficient to give rise to a strong inference that they acted with scienter in making these statements. (Def. Br. (Dkt. No. 37) at 12-16, 20-21)

31

As noted above, the PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind is an 'intent to deceive, manipulate, or defraud.'" Defer LP v. Raymond James Fin., Inc., No. 08 Civ. 3449 (LAK), 2010 WL 3452387, at *4 (S.D.N.Y. Sept. 2, 2010) (quoting South Cherry Street, LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108 (2d Cir. 2009)). An inference of scienter is sufficiently strong if, based on the facts alleged, "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc., 551 U.S. at 324. Allegations of scienter must be substantiated by specific facts and may not be pled in general terms: "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." ATSI Commc'ns, Inc., 493 F.3d at 99.

"The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." Id.

Here, Plaintiffs argue that the Amended Complaint's factual allegations constitute strong circumstantial evidence of conscious misbehavior or recklessness by Defendants. (See Cmplt. ¶¶ 321-58; Pltf. Br. (Dkt. No. 41) at 17-22) The Second Circuit has held that

> "[t]o survive dismissal under the 'conscious misbehavior' theory, [plaintiffs] must show that they alleged reckless conduct by the [defendants], which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'

Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quoting In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted)). "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that

32

the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" ECA & Local 132 IBEW Joint Pension Trust of Chicago, 553 F.3d at 199 (quoting Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)).

## A.   Pre-June 2008 Statements

With respect to statements made before June 2008 – when Jung received the whistleblower letter – Plaintiffs allege that Defendants knew or consciously disregarded the fact that Avon employees were violating the FCPA when they made statements praising Avon's success without disclosing that it resulted from bribing foreign officials.

As to the pre-June 2008 period, Plaintiffs attempt to demonstrate the required scienter as to Jung by arguing that (1) her position in the company would have made her aware of the violations, and (2) she would have become aware of the violations, or perhaps participated in the violations, as a result of her meetings with Chinese officials about Avon's desire to obtain a license to engage in direct selling.  (Cmplt. ¶¶ 42, 146, 149)

In support of their first argument, Plaintiffs allege that in 2005 Avon announced that it would begin managing its operations in China as a "stand-alone business unit[ ]" as part of an "initiative to eliminate layers in [Avon's] organization, give management a clearer line of sight to day-to-day business operations and get closer to its Representatives and customers." (Id. ¶ 40; see id. ¶ 37) A December 7, 2005 Form 8-K states that "the restructuring was designed to 'bring senior management closer to its key business geographies'" and included "reporting to Andrea Jung." (Id. ¶ 40)

As part of this restructuring, an individual named Gallina – one of the employees Avon eventually put on administrative leave in connection with its FCPA internal investigation, and who then retired – was made Senior Vice President of Avon's China business unit.   (Id. ¶¶ 8, 38)  Avon's Chinese operations reported to Avon's U.S. headquarters through Gallina. (Id. ¶ 39)  According to Plaintiffs, confidential witnesses have confirmed that "from 2000 to 2009 . . . Jung took responsibility for reviewing and approving Gallina's expenses," and "Gallina . . . needed Jung's approval to receive reimbursement of his expenses." (Id. ¶¶ 42, 127) Plaintiffs argue that as a result of the restructuring, Jung was "well aware of the day-to-day management issues that arose at Avon China . . . includ[ing] . . . evidence about illegal payments made to Chinese government authorities in violation of Avon's corporate policies," and that "[w]ith those finance and audit controls in place, illegal payments made from Avon China's operations – which are thought to total millions of dollars – could not have been made without the knowledge or approval of Avon's senior management." (Id. ¶¶ 43, 128)

In determining whether scienter has been sufficiently pled, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); see Steinberg v. Ericsson LM Tel. Co., No. 07 CV. 9615 (RPP), 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) ("[T]he Complaint ascribes Defendants with scienter based on the generalization that 'as key officers  . . .' Defendants 'knew of facts or had access to information' contradicting their public statements. . . . Yet the Complaint identifies none of this adverse information other than stating, generically, that it was contained in various 'internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and

34

Board of Directors meetings and committees thereof, and via reports' and 'internal non-public reports' provided to Defendants. . . . These boilerplate allegations are not a sufficient basis for alleging scienter."); Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 768, 773 (S.D.N.Y. 2006) ("[T]he complaint alleges generally that defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports. . . . But these bare assertions, without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements.") Allegations "that Defendants received information contradicting their public statements because they held management roles and monitored [company] financial reports" is merely a "'broad reference to raw data' [that] is not sufficient." Plumbers & Steamfitters Local 773 Pension Fund, 694 F. Supp. 2d at 300.

While Avon may have been striving to involve its senior management more in day-to-day business operations in China, Plaintiffs have not pled facts demonstrating the level of involvement senior management actually had after the restructuring, and how this involvement made Defendants aware that Avon employees were paying bribes to Chinese officials.  The Complaint does not allege that Gallina reported the alleged bribes to Jung, much less when and how he did so.  To the extent that Plaintiffs rely on Jung's alleged review of Gallina's expense reports, they have pled no facts regarding the expenses Gallina allegedly reported that made Jung aware of the bribes.  Absent such facts, Plaintiffs' allegations are not sufficient to demonstrate that Jung knew or consciously disregarded the alleged bribery when making Avon's financial disclosures.  See id. (scienter not sufficiently pled where "[p]laintiff has not 'specifically identified any reports or statements' or any dates or time frame in which Defendants were put on

notice of contradictory information") (quoting Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008)).

Plaintiffs also allege that Jung was aware of the bribery because "Avon's most senior executives, including Cramb and Jung, [were] . . . actively involved in . . . . the 'push' for a direct sales license in China." (Cmplt. ¶ 42) "Jung traveled to China several times for meetings with Avon executives to discuss strategy for obtaining the direct selling license from Chinese government officials." (Id.) Plaintiffs further allege that an unnamed senior Chinese Ministry of Commerce official told Plaintiffs' investigator that "Avon executives were 'very close' to [Chinese officials involved in direct selling licensing] . . . and that they frequently met together for 'dinner and karaoke' and Avon 'always' paid the bills." (Id. ¶ 141; see id. ¶ 145) This same official told Plaintiffs' investigator that "Avon received the first direct sales license in China due to contacts that Avon executives developed with the Guangdong Administration for Industry and Commerce agency . . . , the Chinese State Administration for Industry and Commerce ('SAIC') and the [Ministry of Commerce], all of which could only be developed through bribes." (Id. ¶ 143) This official, and an unnamed SAIC official, told Plaintiffs' investigator that "Avon was the first to receive a direct sales license in China, at least in part, due to two meetings between Jung and Chinese Vice Premier Madam Wu Yi" which "could [not] have been obtained without an 'arrangement' or 'under table deals' that would have involved payments of large amounts of money." (Id. ¶¶ 146, 147; see id. ¶ 143)

Plaintiffs have not alleged facts demonstrating that these meetings would have made Jung (or Cramb) aware that Avon employees were bribing Chinese officials, however. The Complaint does not allege that Jung or Cramb participated in the allegedly corrupt "dinner and karaoke" events. Instead, Plaintiffs argue that Jung or Cramb should have been aware of these

36

events because of their supervisory positions.  As discussed above, however, generalized allegations founded solely on an individuals' corporate position are not sufficient to demonstrate scienter.  See Plumbers & Steamfitters Local 773 Pension Fund, 694 F. Supp. 2d at 300. Similarly, conclusory allegations that Jung "could not have obtained" meetings with the Vice Premier without the payment of a bribe – absent further detail or explanation regarding how these meetings were arranged and where and when they took place – are not sufficient to demonstrate that these meetings were, in fact, obtained through the payment of bribes.  See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 813 (2d Cir. 1996) ("Plaintiffs do not . . . enjoy a 'license to base claims of fraud on speculation and conclusory allegations.'" (quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990))).

In sum, the Complaint does not plead facts sufficient to demonstrate that Jung became aware of the alleged bribery scheme prior to June 2008, whether as a result of the meetings she attended or through some other source.  Accordingly, the Complaint's allegations are not sufficient to give rise to a strong inference that Jung acted with scienter in making allegedly misleading statements regarding Avon's business success prior to June 2008.

As to Cramb, Plaintiffs point to (1) a 2005 internal audit report discussing bribery by Avon employees that Cramb allegedly received; and (2) Cramb's termination in 2012 "in connection" with the bribery investigation.  (Cmplt. ¶¶ 334, 338, 341)

Plaintiffs allege that a "draft audit report" indicating that Avon employees had paid bribes to Chinese government officials was "generated at Avon no later than June 2006, and possibly as early as 2005" and that Cramb was aware of the report but "sought to conceal the unlawful activities."  (Id. ¶ 129)  For the internal audit report to serve as evidence of scienter,

Plaintiffs must allege sufficient facts showing that Cramb was aware of the report and its contents at the time he made the allegedly misleading statements on Avon's behalf.  See Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("The allegations must show both '(1) specific contradictory information [that] was available to the defendants (2) at the same time they made their misleading statements.'" (quoting In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009))) (emphasis in PXRE).

   In this regard, Plaintiffs point to the account of an unnamed former Avon employee who claims that Fabian LaPresa – Avon's Global Internal Audit Director from June 2004 through June 2006 – "received via email a draft copy of [the] internal audit report of Avon China that had uncovered inappropriate payments made to Chinese officials." (Cmplt. ¶ 130; see id. ¶ 6) According to the witness, LaPresa "exploited his knowledge of [the] audit report in discussions with [Kerry] Carr, his immediate superior" – who "'officially' reported to the Audit Committee of Avon's Board of Directors, but operationally reported to Cramb," (id. ¶ 136) – in order to obtain a more favorable severance package than Avon usually gave its employees. (Id. ¶ 133; see id. ¶ 137)  LaPresa ultimately received a year of severance benefits – normally "provided only to employees who were terminated as part of a 'major restructuring'" – rather than the standard three months of benefits. (Id. ¶¶ 134-36)  The witness "confirmed that Carr . . . would have needed Cramb's approval to increase LaPresa's severance package to the level of termination benefits he eventually received" when terminated in June 2006. (Id. ¶ 136) According to Plaintiffs, the witness's statements "indicate that Cramb received information about [the] audit report no later than June 2006." (Id. ¶ 137)

   "[A]s with all allegations going to scienter, confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of

38

public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient." Glaser, 772 F. Supp. 2d at 591; see also In re Gentiva Sec. Litig., 932 F. Supp. 2d at 375 (same). "[T]he Court must assess whether there are allegations that [confidential witnesses] were privy to the Individual Defendants' knowledge or had direct contact with the Individual Defendants, such that the Individual Defendants are alleged to have knowledge of or access to contemporaneous information that would show that their representations were false." In re Gentiva Sec. Litig., 932 F. Supp. 2d at 378.

Here, the confidential witness's conclusory assertion that Carr "would have needed Cramb's approval" to increase LaPresa's severance package is not sufficient to demonstrate that Cramb was aware of the alleged FCPA violations discussed in the alleged draft report. First, these allegations do not establish that Cramb's approval for LaPresa's severance package was in fact sought. Even if Cramb's approval was sought, Plaintiffs have not pled facts demonstrating that Cramb was aware that Carr sought additional severance benefits for LaPresa because LaPresa was threatening to disclose the bribery findings in the alleged draft audit report, or that Cramb was aware of the allegations contained in the report. In sum, the confidential witness's account does not demonstrate with particularity that Cramb was aware of the internal audit report or the violations described therein.

Plaintiffs also point to Cramb's January 2012 termination as circumstantial evidence creating a strong inference of scienter. (Cmplt. ¶¶ 338-39, 341) In a Form 8-K filed on January 30, 2012, Avon announced that Cramb was terminated "in connection with the Company's previously disclosed internal investigation and the Regulation FD [improper disclosure] matter." Avon Products, Inc., FORM 8-K (Jan. 30, 2012), available at

39

http://www.sec.gov/Archives/edgar/data/8868/000000886812000002/item502.htm (last accessed

Sept. 27, 2014)); (see also id. ¶ 78)

       Such evidence may indeed "add to the overall pleading of circumstantial evidence

of fraud." In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)

(finding that the resignations of two employees, "although not sufficient in and of themselves,"

were circumstantial evidence of scienter).  The allegations here, however, are not sufficiently

particularized to demonstrate that Cramb knew – prior to June 2008 – of the FCPA violations.

Other than alleging that Cramb was aware by June 2006 of the 2005 internal audit report – a

claim that, as previously discussed, is not supported by sufficient factual allegations – Plaintiffs

provide no basis for this Court to conclude that Cramb was aware of the alleged FCPA violations

prior to June 2008.[5]

---

[5] Cramb's January 2012 termination likewise does not create a strong inference of scienter as to
statements made post-June 2008.  Avon stated that Cramb had been terminated "in connection
with the Company's previously disclosed internal investigation and the Regulation FD [improper
disclosure] matter." (Avon Products, Inc., FORM 8-K (Jan. 30, 2012), available at
http://www.sec.gov/Archives/edgar/data/8868/000000886812000002/item502.htm (last accessed
Sept. 27, 2014))  As the Complaint acknowledges, at the time of his termination, Cramb was
under investigation by the SEC for having improperly disclosed material information about the
progress of Avon's FCPA investigation to a Citibank financial analyst. (Id. ¶¶ 81, 319 & n.161,
347); see also Aruna Viswanatha & Jessica Wohl, Avon's Cramb Gave Citi Bribery Probe Info,
REUTERS, Nov. 1, 2011, available at http://www.reuters.com/article/2011/11/01/us-avon-
idUSTRE7A06HC20111101 (cited at Cmplt. ¶ 347 n.173).  Cramb's alleged improper disclosure
to the Citibank analyst was the subject of a May 25, 2011 Citibank research report. (Cmplt. ¶
347)  Just two days before this report was released – on May 23, 2011 – Avon announced that
Cramb would no longer serve as CFSO, effective in the fall of 2011. (Id. ¶ 77)  The SEC began
investigating this disclosure sometime thereafter, and on October 26, 2011, Avon disclosed that
the SEC had served a subpoena on it "in connection with a Regulation FD investigation of the
Company's contacts and communications with certain financial analysts and other
representatives of the financial community in 2010 and 2011." (Id. ¶ 319)  Throughout Avon's
internal FCPA investigation – which had been ongoing for nearly three years prior to Cramb's
alleged improper disclosure – Cramb had remained in the same position at Avon, with no action
taken against him.  However, just two days before the Citibank report was released, Avon
announced that Cramb would be replaced as CFSO.  Then, two weeks after Avon received the
SEC subpoena concerning Cramb's alleged Regulation FD violation, he was demoted from his

In arguing that Cramb was aware of the FCPA violations throughout the class period, Plaintiffs cite a January 31, 2012 Wall Street Journal article reporting that Cramb "'was fired after allegations emerged that he had been aware of possible corruption involving foreign officials in China as early as the middle of the last decade.'" (Cmplt. ¶ 78 (quoting Palazzolo & Lublin, supra) (emphasis omitted); see id. ¶ 138). "Although a plaintiff may use such sources in pleadings, 'the news articles cited still must indicate particularized facts about a defendant's conduct in order to support [the] claims.'" Plumbers & Steamfitters Local 773 Pension Fund, 694 F. Supp. 2d at 300 (quoting Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007)) (alteration in original); see also In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("'"[N]ewspaper articles should be credited only to the extent that other factual allegations would be – if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."'" (quoting In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007) (quoting In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000)))).

Here, the article Plaintiffs cite states that information regarding Cramb's termination was obtained from "a person familiar with the matter." Palazzolo & Lublin, supra.

---

CFSO position and became vice chairman of Avon's developed market group. (Id. ¶ 23) Less than three months after the SEC subpoena concerning the alleged improper disclosure, Cramb was fired. Given the proximity between (1) the release of the Citibank report and the announcement that Cramb would be replaced as CFSO, and (2) Cramb's demotion and later termination and the subpoena seeking information about the improper disclosure of material information, the inference that Cramb was terminated because he knew about FCPA violations is not as compelling as the inference that Cramb was fired because of his improper disclosure of material information about the internal FCPA investigation. See ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F.3d at 198 ("[T]he court must ask, 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" (quoting Tellabs, Inc., 551 U.S. at 326)).

This vague description of the source provides no basis for the Court to evaluate its reliability. Cf. In re Gentiva Sec. Litig., 932 F. Supp. 2d at 375 ("[C]onfidential witnesses may be probative of scienter only where each of their accounts is 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (quoting In re Daou Sys., Inc., 411 F.3d 1006, 1015 (9th Cir. 2005))). Because the article Plaintiffs cite presents no particularized facts to support the allegation that Cramb was aware of the bribery by 2005, and because there is strong circumstantial evidence that Cramb was fired because of his alleged improper disclosure of material information concerning the internal FCPA investigation, the article is not sufficient to demonstrate that Cramb possessed the requisite scienter with respect to any particular statement made within the Class Period.[6]

Finally, the 2011-12 SEC and DOJ investigations of Avon do not give rise to a strong inference of scienter as to pre-June 2008 statements. (Cmplt. ¶¶ 347-51) "Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter. . . . [However] the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of

---

[6] Plaintiffs also allege that Jung's loss of the CEO position in December 2011 constitutes evidence of her scienter. (Cmplt. ¶ 340) The facts regarding Avon's change in CEO are not sufficient to demonstrate Jung's scienter, however. The only link Plaintiffs provide between Jung's loss of the CEO title and the alleged FCPA violations is the conclusory allegation that "[a] number of articles have noted that the Company's decision to remove Jung from the CEO position was tied, at least in part, to the ongoing FCPA investigation." (Id.) Plaintiffs refer, for example, to a FashionMag article noting that the CEO change came "as the cosmetics company [was trying] to recover from a myriad of problems, including a federal bribery probe and weak sales in key international markets." Brad Dorfman, Avon to Separate Roles of Chairman, CEO, FASHIONMAG, Dec. 14, 2011, available at http://us.fashionmag.com/news/Avon-to-separate-roles-of-chairman-CEO,221546.html#.UwipKyi6fgR (last accessed Sept. 27, 2014). Neither Avon's CEO change nor the articles written about that development demonstrate that Jung acted with scienter.

scienter. . . ." In re Gentiva Sec. Litig., 932 F. Supp. 2d at 380.  Moreover, as the Complaint

concedes, both of those investigations were commenced by Avon's voluntary disclosure of

alleged FCPA violations, which weighs against a finding of scienter.  Cf. In re Bausch & Lomb,

Inc. Sec. Litig., 592 F. Supp. 2d 323, 329, 343 (W.D.N.Y. 2008) (finding that a strong inference

of scienter was not pled where defendants launched an "independent investigation into alleged

misconduct . . . which had been reported to [the company's] senior management by [an]

employee [and] . . . [in addition] voluntarily reported the . . . matter to the SEC").

   The Complaint does not plead facts sufficient to give rise to a strong inference of

scienter with respect to statements made about Avon's success prior to June 2008.  The facts that

are pled are too conclusory and lacking in detail to demonstrate that Defendants knew of or

consciously disregarded FCPA violations by Avon employees at the time these statements were

made.  Accordingly, to the extent that Plaintiffs' claims are based on pre-June 2008 statements

discussing Avon's business success, they will be dismissed.

  **B.** **July 2008 Statements**

   Jung's receipt of the whistleblower letter in June 2008 put Defendants on notice

that FCPA violations had potentially occurred in connection with Avon's Chinese operations.

Avon did not disclose the letter or its internal investigation of the allegations in its July 30, 2008

Form 10-Q, accompanying SOX certification, or quarterly earnings call, however.  (Cmplt. ¶¶

240-42)  Plaintiffs argue that these statements were materially false and misleading because

> Defendants failed to disclose that the Company's achievements in China, as well
> as the successful "business model" then in place, was significantly attributable to
> the illegal bribery scheme that had opened the direct selling market to Avon and
> could not have occurred but for that scheme. . . . Additionally, the statements
> failed to address or discuss the significant risk that, once the illegal bribery
> payments were revealed publicly, the Company would be exposed to criminal and
> regulatory investigations, significant damage to reputation, and other losses and

costs. Finally, the Defendants failed to disclose that an internal FCPA investigation regarding Avon China had commenced in June 2008.

(Id. ¶ 243)

The mere fact that Jung received the whistleblower letter, however, does not demonstrate that Avon knew that the allegations in the letter were true or consciously disregarded proof of the alleged bribery scheme in making Avon's financial disclosures. Moreover, the fact that Avon commenced an internal investigation tends to undermine any inference of scienter. See In re Bausch & Lomb, Inc. Sec. Litig., 592 F. Supp. 2d at 329, 343; see also Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010) (finding that scienter was not sufficiently pled where the "facts [did] not support an inference that [defendant] was trying to hide anything from its investors. Rather, they suggest[ed] that [defendant] . . . was endeavoring in good faith to ascertain and disclose future losses."); Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 187 (4th Cir. 2009) ("Later disclosures that timely raised questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith.").

It is also well settled that "[d]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises." In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008); see also Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."). Although Plaintiffs allege that Defendants were acting with an intent to defraud investors, "[a]n alternative and much more reasonable inference" as to why the internal investigation and whistleblower letter were not disclosed in July 2008 "is that Defendants [were] us[ing] this time to investigate, to gather more

information, and to confer with [the DOJ and the SEC] before taking any action." See In re Elan

Corp. Sec. Litig., 543 F. Supp. 2d at 217. This alternate inference is bolstered by the fact that,

after a preliminary investigation, Defendants disclosed in their next public filing in October 2008

the whistleblower letter and the resulting internal investigation, and also announced that the

allegations in the letter appeared to be credible. See Slayton, 604 F.3d at 777.

Because Plaintiffs have not pled facts sufficient to give rise to a strong inference

of scienter with respect to the July 2008 statements, their claims related to those statements will

be dismissed.

C.      **Statements Between October 20, 2008 and July 30, 2009**

Defendants announced Avon's investigation of possible FCPA violations on

October 20, 2008. (Cmplt. ¶¶ 65, 66, 245, 246) In subsequent public filings, Avon reiterated

this announcement and at times expanded upon it as the investigation proceeded. (See, e.g., id.

¶¶ 250, 258, 264, 272, 280, 282, 287, 290, 293, 306, 310, 317) Plaintiffs nonetheless allege that

Avon's statements regarding increases in its revenue after October 20, 2008 were materially false

and misleading. In particular, Plaintiffs point to the following statements:

> (1) On October 30, 2008, "Jung told analysts on the quarterly earnings conference
> call that '[i]n China, revenue in third quarter increased 25%, 13% in local
> currencies, with active representatives nearly doubling versus a year ago, and
> these results reflected our continued strategic investments in this important
> market.'" (Id. ¶ 253);
>
> (2) On February 3, 2009, Jung stated in a press release that
>
>> [w]e believe our model is well suited to create income opportunities in
>> these difficult economic times, as we have during past challenges. . . .
>> Throughout our history, these advantages have allowed Avon to emerge
>> well positioned as economic conditions improve.
>>
>> . . .
>>
>> We are fortunate to be facing these challenging times from a position of

45

financial strength. We have a solid balance sheet, an operating model that generates healthy cash flow and a continued commitment to our dividend. This strong foundation, coupled with . . . the competitive advantages of our direct selling business model, gives us confidence to look past 2009's challenges and to continue our focus on long-term sustainable, profitable growth.

(Id. ¶ 254);

(3) On February 3, 2009, Jung stated in an analyst call that

[a]nother bright spot in the portfolio in the quarter was China, where revenue in local currency grew 17%. Active representatives grew 88%. The number of certified sales promoters in China is now almost 1 million. And this was accomplished in just three years. We were pleased with our progress against representative activity in the quarter, with the level exceeding 50% in the last month of the year.

(Id. ¶ 254 (emphasis omitted));

(4) In February 20, 2009 Form 10-K, Avon stated that

[r]evenue in China increased for 2008, primarily due to an increase in Active Representatives, partially offset by a lower average order. The growth in Active Representatives reflected continued expansion of our direct selling efforts, which were supported with significant Representative recruiting, television advertising and field incentives. The lower average order resulted from the continued expansion of direct selling, as Representatives order in smaller quantities than beauty boutiques, and orders from new Representatives tend to be smaller than the average direct selling order. Beauty boutique ordering activity levels have remained steady during this extended period of direct selling expansion, as our beauty boutique operators continue to service our Representatives.

. . .

Total revenue [in Latin America] increased for 2008, driven by a larger average order and growth in Active Representatives, as well as favorable foreign exchange. Growth in Active Representatives reflects significant investments in RVP and a continued high level of investment in advertising. Revenue for 2008 benefited from continued growth in substantially all markets. In particular, during 2008, revenue grew 24% in Brazil, 36% in Venezuela, 5% in Mexico and 3% in Colombia. Revenue growth in Brazil was driven by higher average order, growth in Active Representatives and the impact of foreign exchange. Revenue growth in

Venezuela was driven by higher average order, while revenue in Mexico benefited from growth in Active Representatives.

(Id. ¶¶ 259, 261 (emphasis omitted));

(5) In a May 5, 2009 Form 10-Q, Avon stated that in China "'[r]evenue increased in the first quarter of 2009. . . . The growth in Active Representatives reflects continued expansion of our direct selling efforts, which were supported with continued Representative recruiting, television advertising and field incentives.'" (Id. ¶ 265);

(6) In a May 5, 2009 analyst call, Jung stated that in China "'[w]e continue to bring in over 40,000 new sales promoters each month. Active representatives in this market were up over 40% in the quarter. We now have almost 0.5 million active representatives in China. So the direct selling business in this market remains healthy and growing.'" (Id. ¶ 267 (emphasis omitted));

(7) In a July 30, 2009 press release, Jung stated that "second quarter revenue in China had grown 15 % (13% in local currency) year over year" because Avon's "'bold strategies to counter the recession are working. We've been successful at gaining Representatives and consumers during these tough economic times. This confirms our belief in the inherent advantage of our direct-selling business model.'" (Id. ¶ 275 (emphasis omitted)); and

(8) During a July 30, 2009 analyst call, Jung stated that she was "'pleased with the progress [in China], and without giving you a forecast for whether the growth will accelerate, I think you can continue to look at China as a major growth driver for the corporation'" and that "'I think we still feel good about China. I think the double-digit growth that we're seeing is certainly being driven by strength in direct sales.'" (Id. ¶ 277-78 (emphasis omitted))

Plaintiffs claim that these statements were materially false and misleading because Defendants did not disclose that Avon's increased revenue was attributable to bribes paid to foreign officials, or that – if the "full extent of Avon's illegal practices became known" – Avon "would be exposed to criminal and regulatory investigations, significant damage to reputation, and other losses and costs." (See Cmplt. ¶¶ 253, 254-55, 256-57, 259-60, 261-62, 265-66, 267-68, 275-76, 277-79)

Plaintiffs have not alleged sufficient facts, however, to demonstrate that Defendants were aware that Avon's financial successes in 2008 and the first half of 2009 were

47

the result of FCPA violations, or that Defendants knew the extent to which bribes paid during earlier periods contributed to those successes. The whistleblower's letter does not raise an inference that Defendants possessed such knowledge. The Amended Complaint alleges only that the whistleblower stated that "travel and entertainment expenses reported in the Company's China operations may have violated the FCPA" (id. ¶ 66), and that "[t]hese violations reportedly included gifts and improper travel expenses paid by Avon employees to certain Chinese officials." (Id. ¶ 333) It may well be that the whistleblower's letter alerted Defendants in June 2008 to the possibility that – at some earlier period – some of Avon's financial success may have been attributable in part to bribes paid to Chinese officials. As Plaintiffs acknowledge in the Complaint, however, Avon's October 20, 2008 press release (Martin Decl. (Dkt. No. 38), Ex. 5) disclosed the possibility that the payments booked as travel and entertainment expenses "reflected nothing more than illegal payments that Avon made to Chinese government officials or their proxies to gain a business advantage in China." (Cmplt. ¶ 66) The Amended Complaint does not allege, however, that the whistleblower indicated that Avon's direct-selling licenses were obtained through bribes, or that bribery was ongoing at that time.

Plaintiffs also attempt to demonstrate scienter by relying on the pre-October 2008 facts discussed above and generalized allegations that – because Avon was successful in obtaining direct selling licenses, and because bribery of Chinese officials by foreign companies is allegedly pervasive – Defendants must have known in October 2008 and afterward that Avon employees bribed Chinese officials to obtain Avon's licenses, and that financial successes during that period were attributable to bribes. (See, e.g., id. ¶¶ 48-51, 72) As previously discussed, such conclusory claims are not sufficient to demonstrate scienter.

48

Plaintiff's reliance on an October 31, 2008 Wall Street Journal article to establish scienter is likewise unpersuasive. (See ¶¶ 69-70)  The article reports that "China's government in recent weeks has detained officials involved in licensing foreign companies to operate in China, in what appears to be a widening corruption probe that has touched most obviously on the direct-selling business.'" James T. Areddy & Ellen Byron, China Detains Key Officials Who Regulate Foreign Firms, WALL ST. J. ASIA, Oct. 31, 2008, at 1; (see Cmplt. ¶ 69)  The article observes that "this news comes at a time when New York-based Avon Products Inc. says it may have found improprieties in its operations in the country." Areddy & Bryon, supra.  The article also claims that "the suspected bribery in China by Avon officials involves several million dollars, according to a person familiar with the company's internal investigation." (Id.; see also Cmplt. ¶ 70)

While the Wall Street Journal article suggests that the arrest of Chinese officials and Avon's announcement may be related, it does not demonstrate with particularity that Defendants were aware that Avon had obtained its licenses through bribes, or that its financial successes in 2008 and the first half of 2009 were the result of bribes.  Instead, the article merely reflects speculation that – given the timing – the arrests of Chinese officials might somehow be related to Avon's internal investigation.  Such "speculation and conclusory allegations will not suffice" to plead scienter, however.  Ganino v. Citizens Utilities Co., 228 F.3d 154, 169 (2d Cir. 2000).  Moreover, the article's assertion – based on an unnamed source – that "the suspected bribery . . . involve[d] several million dollars" does not alter the analysis.  Because the article does not reveal the identity or position of the person who provided the information, it is impossible to evaluate its reliability.  See Plumbers & Steamfitters Local 773 Pension Fund, 694 F. Supp. 2d at 300; In re Gentiva Sec. Litig., 932 F. Supp. 2d at 375.

In considering whether the October 31, 2008 Wall Street Journal article demonstrates scienter, it must also be noted that Avon was not the only foreign company engaged in direct sales in China. As the Wall Street Journal article acknowledges, other companies engaged in direct sales in China had recently opened internal investigations concerning allegations of bribery:

> [i]n April this year [(2008)], documents leaked from inside closely held Mary Kay Inc., another direct seller, appeared to offer a peek into questionable business practices as they named more than 200 bureaucrats responsible for regulating direct sellers in a southern province and listed in detail about $100 worth of Mary Kay products each person was given, for a total in the tens of thousands of dollars.

Areddy & Byron, supra; see also Avon Awarded First Direct Sales License, ASIA TIMES ONLINE, Mar. 1 2006, http://www.atimes.com/atimes/China_Business/HC01Cb03.html (cited at Cmplt. ¶ 32 n.17) (noting that Amway and Nu Skin Enterprises, both U.S. companies, were among "other foreign direct sellers [who were] . . . preparing applications or [were] undergoing the application process" to obtain licenses for direct sales in China). Accordingly, the mere fact that certain Chinese officials involved in licensing foreign corporations to engage in direct sales had been detained does not demonstrate with particularity that Defendants knew that Avon's license had been obtained through bribes.

Nor does Plaintiffs' allegation that "[b]y July 2009, Avon's internal investigation expanded to include additional international markets" (Cmplt. ¶ 335), demonstrate that Defendants' July 30, 2009 statements about Avon's performance in China were made with the requisite scienter.

Although Avon announced increased revenue from China during the October 2008 to July 2009 time period, it continued to make disclosures about its continuing investigation of possible FCPA violations in China. (See, e.g., id. ¶¶ 250, 258, 264-65, 272)

"These facts do not support an inference that [Avon] was trying to hide anything from its investors. Rather, they suggest that [Avon] had disclosed its [investigation of possible FCPA violations in October 2008], and that it was endeavoring in good faith to ascertain and disclose [the results of that investigation]." See Slayton, 604 F.3d at 777.

Moreover, by announcing that an internal FCPA investigation had been undertaken, and that the SEC and DOJ had been advised of that investigation, Avon put the investing public on notice that Avon might be "exposed to criminal and regulatory investigations, significant damage to reputation, and other losses and costs," contrary to Plaintiffs' claim. As Avon warned in its October 30, 2008 Form 10-Q, it "[could not] predict how the resulting consequences [of its FCPA investigation], if any, may impact [its] internal controls, business, results of operations or financial position." (See Cmplt. ¶ 250)

Because Plaintiffs have not pled facts sufficient to give rise to a strong inference of scienter with respect to Avon's statements regarding financial performance between October 30, 2008 and July 30, 2009, their claims related to those statements will be dismissed.

### III. AVON'S OCTOBER 28, 2010 AND FEBRUARY 8, 2011 STATEMENTS REGARDING DECLINES IN REVENUE ARE NOT MATERIALLY FALSE AND MISLEADING

Plaintiffs also claim that Avon's disclosures in its October 28, 2010 Form 10-K and February 8, 2011 8-K – which report declines in revenue – were materially false and misleading because they "did not disclose the full scope of Defendants' bribery scheme[ ] [and the] consequences thereof." (Id. ¶¶ 297, 298, 303, 305) In the October 28, 2010 disclosure, Avon announced that

> [t]otal revenue for the three- and nine-month periods ending September 30, 2010, decreased due to significant revenue declines in both direct selling and Beauty Boutiques. The fundamental challenges in our complex hybrid business model, including conflicting needs of retail and direct selling, impacted both businesses,

resulting in a 36% and 25% reduction in Active Representatives for the three- and nine-month periods, respectively. Our continued transition away from our complex hybrid business model to one which focuses on direct selling and updating our service center model, is expected to include a realigned field compensation structure and recalibrated merchandising and campaign management strategies to support direct selling.

(Id. ¶ 296)  Similarly, in February 8, 2011, Avon stated that

[f]ourth-quarter revenue in China decreased 45% year over year, or down 47% in constant dollars. The region's revenues continued to be impacted by the company's planned transition away from a hybrid model to one which focuses on direct selling. Units sold decreased 44% and Active Representatives were down 68%.

(Id. ¶ 303)

Plaintiffs have not pled facts demonstrating that these statements were "materially" false and misleading. Stated another way, there is no "substantial likelihood" that a reasonable shareholder would have considered these disclosures to be assurances that Avon had not committed FCPA violations. See ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F.3d at 197.

By October 28, 2010, the investing public was well aware of the investigation into Avon's involvement in FCPA violations. As alleged in the Complaint,

[b]eginning with the Form 10-K filed February 25, 2010, and continuing with subsequent SEC filings throughout the Class Period, Avon stated that not only had it put the SEC and the DOJ on notice of the internal investigation but the Company also was "continuing to cooperate with both agencies and [had] signed tolling agreements with them." A tolling agreement is an agreement between parties to waive the right to dismiss a case because of the expiration of the statute of limitations, providing a party and its counsel with additional time to develop its case. Here, the tolling agreements suggest, among other things, that the SEC and the DOJ ha[d] serious concerns about both the legality of Avon's business practices in China and other foreign markets as well as the Company's disclosures (or lack thereof) concerning those practices and their consequences.

(Id. ¶ 346)  Moreover, in April 2010, Avon publicly disclosed that it had suspended four employees – three of whom worked for Avon China – in connection with its FCPA investigation

(id. ¶ 285), and Avon's possible involvement in bribery in connection with its international operations was widely reported in the media at this time. (See id.) In response to these disclosures, share prices between April 12, 2010 and April 13, 2010 fell 8%. (Id. ¶ 285)

In sum, by October 28, 2010, the investing community was well aware of – and indeed had responded to – the legal, business, and reputational risks Avon faced as a result of its possible FCPA violations. Cf. In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *33 (S.D.N.Y. Sept. 28, 2012), aff'd sub nom., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014) ("[A]lthough it might be true that the articles did not reveal the 'full extent' of the alleged tax scheme, there is no requirement that they reveal everything for the Underwriter Defendants to be relieved of any duty to disclose that they might have. Indeed, because the articles collectively revealed the existence of the DOJ and SEC investigations into UBS's alleged involvement in a tax evasion scheme and the risk that the danger to UBS would grow considerably, there was not 'a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (quoting Basic Inc., 485 U.S. at 231-32)) (emphasis in original).

The October 28, 2010 and February 8, 2011 announcements did not allay these concerns. Indeed, both announcements led to a drop in Avon's stock price. (Cmplt. ¶¶ 297, 304) Because Plaintiffs have not offered sufficient facts to demonstrate that these announcements were materially false and misleading, Plaintiffs' claims related to these statements will be dismissed.

## IV. PLAINTIFFS HAVE NOT ADEQUATELY PLED SCIENTER WITH RESPECT TO STATEMENTS CONCERNING AVON'S COMPLIANCE PROGRAMS AND INTERNAL INVESTIGATION

Plaintiffs also argue that a series of statements that Defendants made during the Class Period about Avon's legal compliance programs were false and misleading, because Defendants did not disclose that Avon's programs to detect and prevent FCPA violations were "woefully inadequate" and at times "virtually non-existent." (Id. ¶ 183) In particular, Plaintiffs point to the following statements:

(1) Avon's 2004 Corporate Responsibility Report (Id. ¶¶ 62-64, 193);

(2) SOX Certifications submitted with Avon's Form 10-Qs (Id. ¶¶ 188-189, 197, 206, 209, 216, 222, 233, 237, 244, 252, 263, 266, 274, 281, 284, 289, 295, 301, 308, 313, 318);

(3) statements in quarterly earnings calls that Avon was "abiding by the regs" and following the regulations (Id. ¶¶ 210, 238);

(4) statements on and after October 20, 2008 that Avon was "voluntarily conducting an internal investigation of its China operations, focusing on compliance with the Foreign Corrupt Practices Act" and that the "internal investigation [was] in its early stage and no conclusion [could] be drawn at [that] time as to its outcome" (Id. ¶¶ 245, 246, 250, 258, 264);

(5) statements on and after October 20, 2008, that Avon could not "predict how the results of the investigation may impact [its] internal controls, business, and results of operations or financial condition" (Id. ¶¶ 272, 280. 282, 287, 293, 299, 306, 317);

(6) statements announcing the suspension of certain Avon employees in connection with the internal investigation (Id. ¶¶ 285, 290, 310);

(7) a statement that the internal FCPA investigation was "a significant cost that [Avon] never anticipated" (Id. ¶ 302); and

(8) statements that Avon's revenue had decreased in light of the company's transition away from a hybrid sales model (Id. ¶¶ 296, 303).

According to Plaintiffs,

> [n]otwithstanding well-established "best practices" (described [in the Federal Sentencing Guidelines and the DOJ's Principles of Federal Prosecutions of Business Organizations]) requiring a large corporation such as Avon to have an effective, company-wide compliance program to prevent law-breaking in general and FCPA violations in particular, . . . the Company had no independent compliance function whatsoever at any time prior to 2009. Even after 2009, Avon's attempt to employ legal and other professionals in a compliance capacity was ineffective, and marked by unaccomplished goals, high turnover, and discord. That complete lack of focus on FCPA compliance, which was well known to Avon's most senior executives and set the tone for Avon's global staff, allowed the Company's internal financial and accounting controls to be circumvented and FCPA violations to continue as late as 2010 – two years after Avon's purported investigation into the China bribery scandal began.[7]

(Id. ¶ 105; see id. ¶ 99)

To adequately plead scienter under this theory, Plaintiffs must demonstrate that Defendants knew or consciously disregarded the fact that Avon's compliance programs and internal controls were inadequate at the time they made the purportedly misleading statements.

In attempting to make this showing, Plaintiffs rely primarily on a lawsuit filed by Avon's former Executive Director of Global Ethics – Debra Hennelly. (Cmplt. ¶¶ 106-13) In her complaint, Hennelly alleges that she informed Avon's General Counsel in 2010 that Avon's compliance programs in Latin America were not adequate to prevent and detect FCPA violations. (Id. ¶ 106) Hennelly claims that the General Counsel refused to institute additional compliance measures because doing so would "inundate" Avon with violations. (Id. ¶¶ 109-13)

---

[7] Plaintiffs also allege that statements made by Avon during and after October 2008 were materially false and misleading in that they "failed to tell the complete story." According to Plaintiffs, Defendants did not disclose the full extent of the bribery scheme, the fact that they had been aware of the scheme for several years, and the significant penalties that Avon would face once the bribery was publicly revealed. (See, e.g., Cmplt. ¶ 248) As discussed above, however, Plaintiffs have not pled facts sufficient to demonstrate that Defendants knew of or consciously disregarded the alleged bribery scheme when making statements on Avon's behalf during the Class Period.

Hennelly's lawsuit was not filed until December 28, 2011, however – after the close of the Class Period. (Cmplt. ¶ 106) Accordingly, the Hennelly complaint does not itself demonstrate that Defendants were aware that Avon's compliance programs were inadequate at the time Defendants made the purportedly misleading statements. While Plaintiffs argue that Jung would have been aware of Hennelly's concerns and the General Counsel's refusal to act upon them during the Class Period – because the General Counsel "reported directly to Jung" (Id. ¶ 106, 122) – simply alleging that Jung supervised someone who was aware of potential inadequacies in Avon's compliance programs – without offering facts demonstrating that Jung herself was aware of these inadequacies – is not sufficient to plead scienter with particularity. See In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d at 538 ("Here, Plaintiff argues that the individual Defendants must have known of Matusiak's concerns, due to their positions in PXRE, and due to PXRE's 'intimate corporate culture.' The Court finds that such allegations fail to support an inference that Defendants knew, or had access to, Matusiak's 'concerns.'") (emphasis in original); see also Plumbers & Steamfitters Local 773 Pension Fund, 694 F. Supp. 2d at 300.

The Amended Complaint also includes statements from several confidential witnesses – former Avon employees – that "Avon did not even have an independent compliance function prior to 2009"; "that, by 2010, Avon still had not implemented key aspects of an FCPA compliance program"; "that Avon's compliance efforts prior to 2009, if any, would have been conducted by attorneys with no specialized compliance experience"; and "that Avon lacked the type of compliance programs that would be expected of a company of Avon's size." (Id. ¶¶ 114, 116; see also ¶¶ 115, 117-19)

Plaintiffs do not allege, however, that these employees' concerns were brought to Jung's or Cramb's attention at any point during the Class Period, nor do Plaintiffs explain how

Jung or Cramb would have reason to know that the compliance programs in place were inadequate to detect FCPA violations. See In re Gentiva Sec. Litig., 932 F. Supp. 2d at 378. While Plaintiffs describe in some detail the former employees' views on compliance standards and the "best practices" set forth in the Federal Sentencing Guidelines and the DOJ's Principles of Federal Prosecutions of Business Organizations, Plaintiffs do not plead with specificity that Defendants were aware of these standards and disregarded them. Merely alleging that Jung and Cramb should be "charged with awareness" (Cmplt. ¶ 332), without more, is insufficient to demonstrate scienter.

Moreover, the fact that Avon announced that it was commencing an internal investigation – including a review of its compliance procedure – when it disclosed the potential FCPA violations supports an inference that Defendants had not been aware of inadequacies in Avon's compliance programs before learning of the potential violations. This action also suggests that – once Defendants learned of potential FCPA violations – they sought to uncover any inadequacies and improve Avon's compliance programs. See Slayton, 604 F.3d at 777. Under these circumstances, Plaintiffs' allegations that Defendants were acting to conceal deficiencies in Avon's compliance programs in their disclosures cannot be said to be "at least as compelling" as the non-fraudulent inference. Tellabs, 551 U.S. at 314.

Plaintiffs have not pled facts giving rise to a strong inference that Defendants acted with scienter when they made the alleged misrepresentations regarding Avon's compliance program and internal investigation. Accordingly, Defendants' motion to dismiss these claims will be granted.

57

## V.   PLAINTIFFS HAVE NOT STATED A CLAIM
## FOR CONTROL PERSON LIABILITY

Plaintiffs also bring a claim against Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities laws." Rombach, 355 F.3d at 177-78.  Because the Court finds that Plaintiffs have not adequately pled any underlying violation of the securities laws, this claim will likewise be dismissed.  See id.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 36).

Plaintiffs have requested leave to amend in the event that this Court dismisses all or part of the Amended Complaint. (Pltf. Br. (Dkt. No. 41) at 28 n.29).  "[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint." Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 91 (2d Cir. 2003) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)).  "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).

Here, Defendants have not pointed to any compelling reason why leave to amend should be denied.  Accordingly, Plaintiffs will be granted leave to amend.  Any Second

Amended Complaint will be filed by October 24, 2014.

Dated:  New York, New York
        September 28, 2014           SO ORDERED.

_____
Paul G. Gardephe
United States District Judge